UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

VELERON HOLDING, B.V.,

                  Plaintiff,

    -against-

                                 No. 12 Civ. 5966 (CM)
                                 FILED UNDER SEAL

BNP PARIBAS SA, et al.,

                  Defendants.
————————————————————————x

## DECISION AND ORDER

McMahon, J.:

      This lawsuit has been cobbled together from two sets of claims against three differently situated groups of defendants.

      The gravamen of the lawsuit – the donkey, if you will – sounds in breach of contract. Plaintiff Veleron Holding, B.V. ("Veleron"), a Netherlands special purpose investment vehicle that fronts for a Russian manufacturing conglomerate, alleges that BNP Paribas SA ("BNP"), a French bank, breached three different agreements relating to a loan issued by BNP to the Russians (through Veleron) to facilitate the purchase of stock in Magna International, Inc. ("Magna"), a Canadian auto parts manufacturer. These agreements were negotiated and signed in Europe. At least two of them are governed by the law of Ontario (the governing law of the third is not pleaded, but since it is a forbearance agreement relating to the first two, it is most likely Ontario law, as well). And the entire deal was plainly and explicitly structured to avoid litigating in a US court.

Veleron has pinned two tails to this donkey.

The first are claims of securities fraud, breach of contract, and tortious interference with contract/prospective economic advantage brought against a number of entities affiliated with the US investment bank Morgan Stanley.[1]  The securities fraud claim is properly before this court – it arises under US law and alleges misconduct by a US corporation in connection with  the disposition of Magna stock owned by the Russian conglomerate and pledged as collateral for the BNP loan.  Although it is among the least artfully pleaded complaints of its genre that I have seen, the First Amended Complaint ("FAC") manages to state a claim for relief.  The breach of contract claim, by contrast, fails, because Veleron asserts rights under the agreements that are non-existent.  The tortious interference claims are time-barred and must be dismissed.

The second tail pinned consists of claims of tortious interference identical to those that are time-barred against Morgan Stanley, only asserted against three foreign banks, one of which claims that no US court has personal jurisdiction over it.[2]  The FAC reveals no obvious reason why New York law would apply to anything these foreign entities did to interfere with a European contract that is governed by Canadian law, or to a European shell corporation's relationship with a Canadian auto parts manufacturer.

The only viable claim against Morgan Stanley – securities fraud – can be litigated independently of the claims against the other defendants.  And it should be.

---

[1] Morgan Stanley; Morgan Stanley Capital Services, Inc.; Morgan Stanley & Co., Incorporated; and Morgan Stanley & Co.  These entities are collectively referred to as "Morgan Stanley."

[2] These defendants are Credit Suisse International ("Credit Suisse"), Nexgen/Natixis Capital Limited ("Nexgen"), and  The Royal Bank of Scotland N.V. ("RBS").  They are referred to collectively as the "Foreign Bank Defendants."  Together with BNP they are collectively referred to as the "Clifford Chance Defendants" because that firm represents them all.

Morgan Stanley's motion to dismiss the complaint against it for failure to state a claim is GRANTED IN PART and DENIED IN PART.

However, the claims against the other defendants belong elsewhere. Therefore, the Clifford Chance Defendants' motion to dismiss on the grounds of *forum non conveniens* is GRANTED – which means the Court need not reach any of their alternative grounds for relief.

## BACKGROUND

### I.   The Parties

Plaintiff Veleron is a company organized and operated under the laws of the Netherlands, with its principal place of business in Amsterdam. Veleron is wholly-owned by Russian Machines ("RM"), a company organized and operated under the laws of Russia. At all relevant times, Russian Machines was a wholly-owned subsidiary of Basic Element ("BasEl"). The sole owner and CEO of BasEl is Oleg Deripaska ("Deripaska").

The parties to this action have changed over time. The remaining defendants are:

Defendant BNP is a bank organized and operated under the laws of France.

Defendant Credit Suisse is a bank organized and operated under the laws of Switzerland, with its principal place of business in Zurich.

Defendant Nexgen is a company organized and operated under the laws of Ireland, with its principal place of business in Dublin.[3]  (O'Connell Decl. ¶ 1.)

Defendant RBS is a bank organized and operated under the laws of the Netherlands. In October 2007, ABN Amro Bank, N.V. ("ABN") was acquired by a consortium of banks,

---

[3] In the FAC, Veleron alleges that Nexgen is a company organized and operated under the laws of France, with its principal place of business in Paris and an office in Manhattan. (FAC ¶ 20.) However, Nexgen is in fact a subsidiary of Natixis S.A. ("Natixis"), which is incorporated in France and is not a defendant in this action. (*See* Clifford Chance Defs.' Support Memo. at 56 n. 14; Veleron's Opp'n at 92 n. 64.)

including RBS, Fortis Bank (Netherland) N.V., and Banco Santander. ABN was divided into three parts, each owned by one of the consortium banks. RBS is the successor-in-interest to ABN with respect to the transactions, agreements, and acts at issue in this litigation.

Defendant Morgan Stanley is a corporation organized and operated under the laws of Delaware. Morgan Stanley's headquarters is located in Manhattan.

## II.   Facts

All facts are taken from the First Amended Complaint ("FAC") and its attached exhibits, and are assumed to be true.

### A.   BasEl/RM's Strategic Investment in Magna

BasEl is a diversified industrial holding company that operates around the world and in a variety of different sectors. (FAC ¶ 22.) Its wholly-owned subsidiary, RM, is also a diversified holding company with assets in, *inter alia*, the automotive industry. (*Id.* ¶ 25.)

On or about May 10, 2007, BasEl and Magna announced that, subject to shareholder and regulatory approval, RM would make a strategic investment in Magna of approximately $1.54 billion, representing 20 million Class A Subordinate Voting Shares (the "Magna Class A Shares"). (*Id.* ¶ 26.)

BasEl and RM turned to BNP to finance this transaction. (*Id.* ¶¶ 32-34.) BNP agreed to underwrite the investment to the tune of $1.2 billion. (*Id.* ¶ 35.) The remainder of the investment ($340 million) was to be made as a direct infusion of equity. (*Id.*)

On or about August 28, 2007, Magna announced that its shareholders had approved RM's investment, and that, subject to certain regulatory approvals, the arrangement would be finalized with an effective date in late September 2007. (*Id.* ¶ 31.)

Veleron was created as a special purpose vehicle for RM's strategic investment. (*Id.* ¶ 38.) Veleron entered into a Credit Agreement (FAC Ex. 1) with BNP on September 20, 2007. (FAC ¶ 38, Ex. 1.) Veleron, as Borrower, and BNP, as Lender and Agent, were the only parties to the Credit Agreement. (*Id.* ¶ 38.)

As security for the $1.229 billion loan (the "Loan"), Veleron pledged the underlying Magna Class A Shares (the "Pledged Collateral") pursuant to a Pledge Agreement (FAC Ex. 1 at B-1) executed the same day. (FAC ¶¶ 39-40.) Veleron provided no additional security for the Loan, nor did BasEl or RM execute a guarantee. (*Id.* ¶ 40.) In the event of a default, BNP's sole recourse was to the Pledged Collateral and, if necessary, to seek payment from Veleron for any deficiency after the sale of the Pledged Collateral. (*Id.*)

Both the Credit Agreement and the Pledge Agreement are governed by the laws of the Province of Ontario, Canada. (Credit Agreement § 1.11.)

Magna announced that RM's strategic investment was complete on September 20, 2007, at which point RM, through Veleron, became a 20% shareholder in Magna. (FAC ¶ 37.)

**B.    The Credit Agreement**

**i.    Assignment and Participation**

Pursuant to Section 13.1(3)(b) of the Credit Agreement, and subject to certain restrictions, BNP was permitted to assign some or all of its rights under the Credit Agreement to an "Eligible Institution." The Credit Agreement defines an Eligible Institution as "a financial institution or other legal entity that is (i) organized or constituted under the laws of a jurisdiction *other than the United States of America or any subdivision or territory thereof* and (ii) is not subject to regulation under the US Margin Regulation or under the Canadian Margin Law

5

Regulation." (Credit Agreement § 1.1(40)) (emphasis added.)  Morgan Stanley could not be an Eligible Institution.

An assignment would become effective when the parties to the Credit Agreement received an executed Assignment and Assumption Agreement (the "Assignment Agreement"), attached to the Credit Agreement as Schedule 13.1(3)(b).  (Credit Agreement § 13.1(3)(b).) Once the Assignment Agreement was executed and delivered, the assignee would be considered a "Lender" for the purposes of the Credit Agreement, with all the attendant rights and obligations of the assignor.  (*Id.*)

Section 13.1(3)(a) of the Credit Agreement permitted BNP to grant a participation to one or more Eligible Institutions, subject to a certain minimum monetary threshold.  The terms "participation" and "participant" were not specifically defined in the Credit Agreement.  (*See* Credit Agreement §§ 1.1(91), 13.1(3)(a).)  However, in the event that BNP granted a participation to an Eligible Institution,  BNP would "remain fully liable for all of its obligations and responsibilities under this Agreement to the same extent as if the participation had not been granted." (Credit Agreement §  13.1(3)(a).)  The participation provision provides further that:

> None of the Participant, [Veleron] and [BNP, as Agent,] shall have any rights against or obligations to one another, nor shall any of them be required to deal directly with one another in respect of the participation by a Participant.  For greater certainty, Participants, as such, shall have no voting rights as 'Lenders' under this Agreement nor direct the voting rights of Lenders hereunder.

*Id.*

### iii.    Confidentiality

Section 14.12 of the Credit Agreement provides that, "The Agent and the Lenders agree to keep confidential any information obtained in relation to the Agreement," subject to a few exceptions.  Where disclosure by BNP, as Agent, would be "necessary for discharging its

6

responsibilities under the Agreement, . . . recipients of such information [must] sign[] a confidentiality and non-disclosure agreement for the benefit of [Veleron] and in form and substance reasonably satisfactory to [Veleron] in advance of receiving such information." (Credit Agreement § 14.12(1)(a).)

### iv.   Repayment and Margin Calls

The Loan's maturity date was September 20, 2009. (*Id.* § 1.1(76).) The Credit Agreement's Mandatory Repayment clause allowed BNP to require Veleron to pay the Loan's outstanding principal and all accrued interest immediately – in effect, to call the Loan – if the closing price of the Magna Class A Shares on the New York Stock Exchange ("NYSE") fell below a certain threshold ($43.8974 per share). (FAC ¶ 53; Credit Agreement § 5.3.)

The Credit Agreement also required Veleron to maintain a certain margin between the outstanding amount owed on the Loan and the value of the Pledged Collateral. (*See* Credit Agreement § 7.5.) When the Required Coverage Ratio dipped below a certain level, Veleron was compelled, within two days of receiving a written demand from BNP, to make a cash payment to BNP. (*See id.* § 7.5(1).) In particular, if the price of the Magna Class A shares fell below $54.79 per share, BNP had the right to make a margin call and Veleron had a corresponding obligation to make a cash payment to BNP in an amount sufficient to restore an appropriate coverage ratio. (FAC ¶ 55.) The Credit Agreement also contemplated the occurrence of an accelerated margin call in the event of further slippage in the value of Pledged Collateral. (*See* Credit Agreement § 7.6.)

### C.   Public vs. Private Sale of the Pledged Collateral

Under the Pledge Agreement, upon the occurrence of a "Realization Event," BNP was allowed to sell the Pledged Collateral, subject to the terms of the Pledge Agreement and other

7

loan documents. (FAC ¶ 58; Pledge Agreement § 4.3.) The proceeds of any sale of the Pledged Collateral were required to be applied in accordance with Section 6.4 of the Credit Agreement. (*See* Pledge Agreement § 4.6.) The proceeds would first be applied to any fees owing to BNP under the fee letter, and then to the Loan's principal and accrued, unpaid interest. (*See* Credit Agreement § 6.4.)

Following the occurrence of a Realization Event, BNP was permitted to sell the Pledged Collateral through a public sale. (FAC ¶ 60; Pledge Agreement § 4.4(4).) If, however, BNP was "unable to effect a public sale of . . . [the] Pledged Collateral within a reasonable period of time by reason of certain prohibitions contained in the Securities Act (Ontario) or the regulations and regulatory orders thereunder, as amended, or any similar legislation then in effect in Ontario or other jurisdictions, or other similar laws," BNP could sell the Pledged Collateral in a private sale. (Pledge Agreement § 4.4(4).) Veleron "acknowledge[d] that any private sale (conducted in a commercially reasonable manner for private sales) of the Pledged Collateral may result in prices and other terms less favourable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agree[d] that any such private sale shall be deemed to have been made in a commercially reasonable manner." (*Id.* § 4.4(6).)

Section 4.1(2) of the Pledge Agreement provided that BNP "and any nominee on its behalf shall be bound to exercise in the holding of the Pledged Collateral the same degree of care as it would exercise with respect to similar property of its own of similar value held in the same place." However, BNP was only liable for gross negligence or willful misconduct – in which case BNP and/or its nominee would be liable for any depreciation or loss of value with respect to the Pledged Collateral. (*Id.*)

8

### D.    The Synthetic Credit Derivative Transactions

In late 2007 and early 2008, in an effort to hedge its risk with respect to the Loan, BNP

entered into a series of synthetic credit derivative transactions with the following parties (*id.* ¶¶

65-66):[4]

1. On or about December 21, 2007, BNP transferred approximately 25% of the credit risk
   associated with the Loan to Nexgen through a credit derivative transaction (*id.* ¶ 66(a),
   Ex. 2);

2. On or about March 20, 2008, BNP transferred approximately 20.34% of the credit risk
   associated with the Loan to ABN, predecessor-in-interest to RBS, through a credit
   derivative transaction (*id.* ¶ 66(b), Ex. 3);

3. On or about March 28, 2008, BNP transferred approximately 8.1% of the credit risk
   associated with the Loan to Morgan Stanley through a credit derivative transaction (*id.* ¶
   66(c), Ex. 4); and

4. On or about April 22, 2008, BNP transferred approximately 12.2% of the credit risk
   associated with the Loan to Credit Suisse through an equity swap transaction (*id.* ¶ 66(d),
   Ex. 5).

Veleron alleges that, until quite recently, it believed that these four institutions were

"Lenders" within the meaning of the Credit Agreement – even though no Assignment Agreement

in the form annexed to the Credit Agreement, duly executed by any of the four institutions, had

ever been delivered to Veleron (delivery being a contractual precondition to an institution's

acquiring "Lender" status under the plain terms of the document, see Credit Agreement §

13.1(3)(b).  (FAC ¶ 67.)  Nonetheless, Veleron claims that BNP repeatedly misrepresented to it

that the four institutions were "Lenders."  (*Id.* ¶ 181.)  This allegation is largely unsupported by

the exhibits attached to the FAC.  For example, Veleron pleads that BNP referred to Morgan

Stanley and the Foreign Banks as Lenders "repeatedly" (*id.* ¶ 181(a)), but does not indicate what

was said or when, and none of the dozens of communications between BNP and Veleron that are

attached as exhibits to the FAC includes any such representation.  Veleron also pleads that BNP

---

[4] BNP also took out two credit insurance policies underwritten by Lloyds of London.  (FAC ¶¶ 71-73, Ex. 6-7.)

"acted as if [Morgan Stanley and the Foreign Bank Defendants] were 'Lenders' by consistently representing that it needed [their] consent to take certain actions." (*Id.* 181(b).)  Again, Veleron does not identify what actions BNP claimed were subject to the consent of the other defendants.

The one arguably particularized allegation of misrepresentation is actually contradicted by the exhibits that allegedly support it.  Veleron specifically contends that BNP's letters calling the loan pursuant to the Credit Agreement (FAC Exs. 28, 33, 35) were sent on behalf of "the Agent and the Lenders" (plural), from which it apparently inferred that the hedging banks were "Lenders." (*See* FAC ¶ 181(c)-(e).)  But the text of the letters gives the lie to this allegation.  The term "Lenders" is a defined term in the Credit Agreement; it means "all of the banks and other financial institutions named on the signature pages of this Agreement, and their permitted successors and assigns."  The four institutions' names do not appear on the signature page of the Credit Agreement, and since no assignments had been executed or delivered, the term could not possibly have referred to Morgan Stanley or the Foreign Bank Defendants.  Consistent with this, the four institutions are not identified as "Lenders" in the correspondence – indeed, their names are not mentioned at all, so the letters contain no representation whatsoever about their status.  This is but one example of one of the many not-so-well pleaded allegations in the FAC that need not be accepted as true for purposes of a motion to dismiss.

Veleron claims that it finally learned that these Defendants were mere Participants, and not Lenders, at some point during a London arbitration between RM and BNP (see below).  The purported significance of this was that, per the Credit Agreement, Participants had (1) no right to vote in connection with such events as when and if to declare an event of default, to enforce rights, to pursue remedies, and to grant or deny forbearance, and (2) of equal importance, no right to direct the vote of any Lender (of whom there was only one, BNP). (FAC ¶ 68, Credit

10

Agreement § 13.1(3)(a)).  Veleron alleges that Morgan Stanley and the Foreign Bank Defendants nonetheless *did* direct BNP's decision to forego the forbearance it had been willing to negotiate and so caused it to call the Loan, declare the Credit Agreement expired, and sell the Magna shares, all in breach of the Credit Agreement.  It contends that the credit derivative transaction confirmations (FAC Exs. 2-5), which were sent to each of the four hedging banks, "demonstrated . . . that BNP had impermissibly delegated many of its rights under the Credit Agreement to [Morgan Stanley and the Foreign Bank Defendants].  In particular, [these defendants] were given the right to direct BNP to terminate the Credit Agreement and liquidate the Pledged Collateral." (*Id.* ¶ 183.)

I assume by this Veleron is referencing the "Realisation of Security and Indemnity" provision of these documents, which states, "Buyer [Party A, or BNP] agrees that . . . following the Security becoming capable of enforcement it shall . . . use reasonable endeavours to realize or procure the realization of the Security."  (*See, e.g., id.* Ex. 4 at 11.).  Elsewhere, the "Security" is defined as "any amounts recovered by the Lenders under any security interests securing the obligations owed to the Lenders by the Borrower [Veleron] under the Reference Obligation [i.e., the Credit Agreement]."  (*See, e.g., id.* at 7.)  In other words, if I am reading the pleading correctly, Veleron contends that the derivative contracts compelled BNP to realize on the Pledged Collateral if the Security became "incapable of enforcement," when BNP's decision should have been discretionary.

Ultimately, none of this will prove relevant to the disposition of the motions, because the Credit Agreement's explicit requirement that an assignment be delivered to Veleron before any new institution could become a "Lender" renders reliance on any of these unidentified "misrepresentations" unreasonable as a matter of law.

11

**E.      BNP Retains Morgan Stanley as Disposal Agent**

On January 31, 2008, BNP and Morgan Stanley entered into an Agency Disposal

Agreement (FAC Ex. 8.) whereby Morgan Stanley was retained to act as BNP's disposal agent

of the Pledged Collateral in the event of a Realization Event.  The Agency Disposal Agreement

is governed by New York law and contains a forum selection clause designating this Court for all

disputes arising out of the agreement.  (Agency Disposal Agreement § 14.)

In the initial recitals of the Agency Disposal Agreement, Morgan Stanley acknowledged

that it was being engaged, pursuant to BNP's rights under the Pledge Agreement, "to act as

[BNP's] agent in respect of certain disposals of the [Magna Class A Shares]."  (*Id.*, WHEREAS

clauses (C), (D); FAC ¶ 76.)  As the disposal agent, Morgan Stanley was authorized to:

> Determine the price at which and the manner in which the [Magna Class A
> Shares] are disposed, provided that such price reflects and will be determined in
> accordance with, the relevant disposal strategy.  Morgan Stanley acknowledges
> that [BNP], in enforcing its security under the Pledge Agreement, is obligated to
> seek the best price available in the market for transactions of a similar size and
> nature at the time of sale, and Morgan Stanley agrees to use all reasonable
> [missing word] to comply with such terms.  (Morgan Stanley may dispose of the
> [Magna Class A Shares], without limitation, on any exchange or other market
> upon which the disposal of the [Magna Class A Shares] may be made in
> accordance with applicable rules, or in any private sale as Morgan Stanley may
> agree with a Buyer or Buyers.  For the avoidance of doubt, Morgan Stanley or
> related parties may act as principal and acquire any [Magna Class A Shares] to be
> disposed of pursuant to this Agreement provided that such acquisitions are
> disclosed to and authorized by [BNP].)

(Agency Disposal Agreement § 2.)

In exchange for its services as disposal agent, Morgan Stanley was entitled to receive a

commission equal to 1.25% of the Gross Realized Proceeds, defined as "the aggregate gross

amount in USD received by Morgan Stanley in respect of the Disposal."  (*Id.* § 3.)

### F.     The 2008 Financial Crisis

As alleged by Veleron, "In late September 2008, the equity markets in the United States –

and, indeed, worldwide – were facing serious dislocations.  As a result, there was downward

price pressure on virtually all equities, and Magna was no exception." (*Id.* ¶ 87.)

While BNP "appeared better able to weather the financial storm than most U.S.

institutions," Morgan Stanley and ABN were "in the midst of a liquidity crisis that threatened

their very existence." (*Id.* ¶¶ 89-90.)  After the collapse of Lehman Brothers, Morgan Stanley

was "generally viewed as the next investment bank in line to fail.  Thus, Morgan Stanley was

under significant pressure to generate liquidity by whatever means it could." (*Id.* ¶ 90.)

### G.     The Margin Calls

Magna's stock price continued to decline throughout late September 2008. (*Id.* ¶ 91.)  As

a result, on September 29, 2008 at or around 8:38 PM GMT, Fabrice Cohen, Vice President of

Equity Financing Trading at BNP in New York, sent several BasEl employees a demand for a

$92 million margin call payment (the "First Margin Call") to be made to BNP Paribas New York

by Veleron. (*Id.* ¶ 91, Ex. 9.)  The payment was due by 1:00 PM EST on October 1, 2008. (*Id.* ¶

91, Ex. 9.)

On September 30, 2008, a representative of BasEl and RM requested, on behalf of

Veleron, that BNP waive the margin call requirement and forbear from enforcing its rights under

the Credit Agreement for a period of at least two weeks to allow for a broader restructuring effort

to take place. (*Id.* ¶ 92, Ex. 10.)  In particular, an authorized instrumentality of the Russian

government, the Bank for Development of Foreign Economic Affairs ("VEB"), had established a

$50 billion emergency fund to assist Russian companies that were having difficulty meeting their

commitments to their lenders. (*Id.* ¶ 93, Ex. 10.)  If BNP was willing to forbear on the margin

call for two weeks, BasEl, RM, and Veleron were confident that they could secure emergency financing from the VEB and repay the entire outstanding balance of the loan at the end of the forbearance period. (*Id.* ¶ 93, Ex. 10.) In exchange for the forbearance, the BasEl/RM representative offered to issue a letter of indemnity backed by BasEl. (*Id.* ¶ 92, Ex. 10.)

That proposal was obviously not acceptable because, at 10:44 PM GMT on September 30, BNP issued a second accelerated margin call (the "Second Margin Call"). (*Id.* ¶ 99, Ex. 13.) Under the Second Margin Call, BNP increased the demand for payment from $92 million, as set forth in the First Margin Call, to approximately $113.8 million, still payable by 1:00 PM EST on October 1, 2008 to BNP Paribas New York. (*Id.* ¶ 99, Ex. 13.)

There is no allegation that either of these margin calls violated any term of any agreement between BNP and Veleron.

### H.   RM's Guarantee

On September 30, 2008, at 8:04 PM GMT, after learning that the Second Margin Call was forthcoming, Andrey Yashchenko ("Yaschenko"), Head of Corporate Finance at BasEl and an RM board member (*id.* ¶ 36), sent an email to a number of BNP employees (all of whom appear to sit in Europe based on their email extensions), on the behalf of Veleron and RM, explaining that RM was prepared to execute a guarantee with respect to the Loan. (*Id.* Ex. 14.) Thereafter, BNP instructed its counsel, Clifford Chance LLP, to prepare a guarantee to be signed by RM in exchange for a waiver and forbearance (the "Guarantee"). (*Id.* ¶ 104.)

On or about October 1, 2008, at 7:19 PM GMT – after the deadlines for the First and Second Margin Calls had passed – BNP sent Yashchenko a first draft of the Guarantee, copying Morgan Stanley and the Foreign Bank Defendants, who, as mentioned above, were on the hook for two-thirds of the risk. (*Id.* ¶ 105, Ex. 16.) BNP's final version of the Guarantee was emailed

14

to Veleron's parent organization in Moscow at 11:27 PM GMT the same night.  (*Id.* ¶ 106, Ex. 16.)  The next morning, Valery Lukin ("Lukin"), the CEO of RM, and Nadezhda Boriuk, RM's Chief Accountant, executed the Guarantee (FAC Ex. 17) and delivered it to BNP in Paris.  (*Id.* ¶ 107, Ex. 16.)

Under the Guarantee, RM agreed to "irrevocably and unconditionally guarantee[] to [BNP] the due and punctual observance and performance by [Veleron] of all of its obligations under or pursuant to the [Credit] Agreement" and "to pay to [BNP] from time to time on demand all sums of money which [Veleron] is at any time liable to pay to [BNP] under or pursuant to the [Credit] Agreement."  (Guarantee § 1.1.1.)

Veleron alleges that, in exchange for the Guarantee, BNP, Veleron, and RM entered into a separate agreement that Veleron would be granted a waiver of the margin calls and a forbearance from enforcement of remedies through, at least, October 15, 2008, while the broader restructuring was put into place (the "Forbearance Agreement").  (FAC ¶ 110.)  No such agreement is attached to the FAC.

## I.    The Disposal of the Pledged Collateral

### i.    Discussions about Disposal

Throughout the day on October 2, 2008, representatives of BNP, Morgan Stanley, and the Foreign Bank Defendants had numerous telephone discussions about disposing of the Pledged Collateral.  (*Id.* ¶ 122.)  BNP's representative, William Rawley, participated in the calls from Paris.  (*Id.* Ex. 21 at 7.)  It is not immediately clear from the FAC or the attached exhibits where the Foreign Bank Defendants dialed in from.  Veleron suggests in its opposition brief that they called in from abroad.  (Veleron's Opp'n at 91.)

During a call that began at 5:21 PM GM, Morgan Stanley indicated that it "already dropped out" by sending in its "termination notice." (*Id.* Ex. 22 at 12.) It is not clear from either the transcript of the call or the FAC what exactly Morgan Stanley meant when it said that it had "dropped out" and sent in its "termination notice;" the only "termination" reference I can find in the credit derivative transaction confirmation FAC Ex. 4) has to do with physical settlement of the credit derivative transaction. However, according to the FAC, BNP's response to this statement was, "I mean it's one for all and all for one. If one party drops out it's the whole pack of cards comes down, the house of cards comes down. So if that's the situation so be it, we're in a liquidation scenario." (*Id.* Ex. 22 at 12.) The FAC suggests that Morgan Stanley was by its comment directing some sort of vote by BNP – specifically dealing with the disposition of the collateral..

### ii. Morgan Stanley's Disposal Strategy

The method that Morgan Stanley selected to dispose of the Pledged Collateral is known as an "accelerated book building" ("ABB"). (*Id.* ¶ 129.) According to the FAC:

> An ABB is a form of private[5] offering in the equity capital markets where a larger block of shares is offered to investors (usually, institutional or other qualified investors) over a short period of time. Generally, the underwriter or book runner in an ABB will market a block of shares to a small group of institutional investors on a strictly confidential basis. The news that an issuer may offer a block of shares through an ABB is in and of itself material, non-public information.

> As a result, any ABB marketing to prospective investors is, as a matter of course, conditioned upon the execution of a confidentiality agreement, and assurances by the approached investor, prior to the identification of the company, that the potential investor will refrain from trading the company's stock or disclosing the fact that an offering is being planned. Confidentiality is key to a successful ABB; if information about a potential ABB leaks, significant opportunities exist for short selling.

---

[5] The defendants assert that an ABB is not a private sale. That dispute of fact is not relevant to the outcome of these motions.

(*Id.* ¶¶ 130-31.) I assume this to be true for the purposes of deciding these motions to dismiss.

### iii.      Leaks of Confidential Information Prior to Disposal

Once Morgan Stanley declared that it had "terminated" and "dropped out" (again,

whatever that means), all of the defendants began to share information about the planned

disposal of the Pledged Collateral with third parties.  (*Id.* ¶ 139.) Veleron alleges that, in so

doing, the defendants breached the confidentiality agreements that they all had "purportedly"

signed in connection with their "participations" in the Loan and released into the marketplace

material, non-public information regarding the upcoming ABB.  (*Id.*)  However, Veleron only

makes specific allegations about leaked information with respect to Morgan Stanley, against

which it brings a federal securities fraud claim.

At some point in the evening of October 2, 2008, a Morgan Stanley trader who was part

of the disposal team received a draft press release prepared by Magna, announcing the

liquidation of Veleron's interest in the company.  (*Id.* ¶ 141.)  The draft press release was sent to

a monitored Morgan Stanley email account used by the trader to send and receive confidential,

sensitive, and non-public information in connection with his work at Morgan Stanley.  (*Id.*)

Shortly after receiving it, but prior to the launch of the ABB on October 3, 2008, the trader

forwarded the draft press release to his private email account, and, from there, to unidentified

third parties.  (*Id.* ¶ 142.)

An unspecified Morgan Stanley employee also allegedly sent Morgan Stanley's disposal

plan to Morgan Stanley's entire ESF arbitrage desk and to all of the other defendants, who

allegedly circulated it among employees who were not involved in the disposal.  (*Id.* ¶ 143.)

17

Finally, Morgan Stanley allegedly revealed confidential, inside information to more than 400 potential buyers relating to the identity of the security being sold, the reasons for the sale of the security, as well as other sensitive information. (*Id.* ¶¶ 132, 144.)

All of these leaks appear to have occurred prior to Magna's publishing the press release. Allegedly, neither Morgan Stanley nor any of the other defendants made an effort to limit dissemination about the pending ABB of the Pledged Collateral. (*Id.* ¶ 143.)

The advance disclosure of this information allegedly enabled certain unidentified Morgan Stanley customers and/or other market participants to take short positions ahead of the sale of the Magna Class A Shares. (*Id.* ¶ 145.) Morgan Stanley itself also took short positions with respect to the Magna Class A Shares while in possession of material, nonpublic information concerning (1) the pending margin calls and (2) the impending disposal. (*Id.* ¶ 146.) These short positions, totaling 360,000 shares, were taken on September 30, October 1, and October 2, 2008. (*Id.*) When the NYSE opened on October 3, 2008, there were indications of massive short selling in Magna stock. (*Id.* ¶ 145.)

### iv.    The ABB

On or about October 2, 2008, at 8:38 PM GMT (4:38 PM EST), Mary Kuan, a New York-based BNP employee, sent an acceleration notice to Veleron. (*Id.* ¶ 147, Ex. 28.) The notice demanded payment of all sums due under the Loan by 8:00 PM EST the same day. (*Id.* ¶ 147, Ex. 28.) If payment was not made, BNP, as Agent, would take further steps to recover Veleron's indebtedness, including enforcement of all security under the Pledge Agreement. (*Id.* ¶ 147, Ex. 28.)

At approximately 1:10 AM EST on October 3, 2008 (i.e., a few hours before Morgan Stanley launched the ABB), Magna published the press release, announcing that "the lender to a

18

wholly-owned subsidiary of [Russian Machines] has realized against the 20 million Magna Class

A Subordinate Voting Shares pledged as security for the financing obtained by Russian

Machines for its September 20, 2007 investment in Magna" and that "up to 20 million Magna

Class A Subordinate Voting Shares will be disposed of at the direction of Russian Machines'

lender."[6]  (Polkes Decl. Ex. B.)

On October 3, 2008, Morgan Stanley launched the ABB of the Pledged Collateral out of

its New York office.  (*Id.* ¶ 148.)  Between 7:00 AM and 9:45 AM EST, Morgan Stanley sold

18,671,512 Magna Class A Shares to approximately 46 investors in a "private, off-market sale"[7]

at an average price of $37.60 per share.  (*Id.*)  The remaining 1,238,488 shares were sold on the

public market at an average price of $41.65 per share.  (*Id.*)  The closing price for Magna stock at

the end of the day was $43.45 per share.  (*Id.*)

Throughout the ABB, Morgan Stanley allegedly worked with the other defendants to

allocate their profits and risks by controlling the price at which the Magna Class A Shares were

sold.  (*Id.* ¶ 149.)  This allowed the defendants to participate in the ABB and realize risk-free

profits proportional to their original exposure under the "participation scheme."  (*Id.*)

In particular, before the ABB, Morgan Stanley analyzed each defendant's break-even

point based on the terms of "their respective agreements" (presumably the credit derivative

agreements).  (*Id.* ¶ 150.)  An agreement was also reached during the ABB to fix the sale price of

Magna Class A Shares so that BNP would receive the largest possible block of shares at a lower

---

[6] The press release may be considered on this motion to dismiss, because Veleron references it in paragraphs 141-42 of the FAC and because this Court may take judicial notice of it as a matter of public record. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 210 n. 10 (S.D.N.Y. 2004).

[7] As noted, *supra*, the parties contest whether an ABB can be considered a private sale.

price than any other ABB participant. (*Id.*) And, indeed, BNP was the single largest purchaser of the Magna Class A Shares during the ABB, acquiring 2,777,778 shares at a price of $36.47 per share. (*Id.*) BNP realized approximately $19.38 million in immediate profit as a result. (*Id.* ¶ 152.)

In addition to the commissions that Morgan Stanley received on the trades and its fee under the Agency Disposal Agreement, Morgan Stanley purchased Magna Class A Shares during the ABB to cover its short positions. (*Id.* ¶ 154.) Morgan Stanley's profits from its short positions totaled approximately $4 million. (*Id.* ¶ 155.)

By the end of business on October 3, 2008, RM's strategic investment in Magna had been entirely unwound. (*Id.* ¶ 156.)

### J.   BNP Seeks Deficiency Amounts from Veleron

Veleron alleges, in excruciating detail, all of the back and forth between BNP and Veleron over BNP's efforts to recover the shortfall between the proceeds generated by the ABB/the sale on the open market of the shares not disposed of in the ABB and the outstanding amount of the Loan. BNP claimed that Veleron was responsible for a deficiency of approximately $80 million. In this correspondence, BNP represented that one unnamed bank had shorted Magna at the time of the acceleration notice. (*Id.* Ex. 40.)

### K.   The London Arbitration

Following payment by its insurance carrier of approximately $7.8 million (*id.* ¶ 176, Ex. 42), BNP made no further efforts to recover any deficiency amounts from Veleron. (*Id.* ¶ 177.) Instead, BNP decided to go after RM, as Veleron's guarantor. It sent a letter dated July 23, 2010, demanding that RM hand over $87,143,453.55, which purportedly represented the amount

due by Veleron to BNP under the Credit Agreement together with interests, costs, and over $700,000 in legal fees. (*Id.* ¶ 177, Ex. 43.)

On August 6, 2010, BNP filed a request for arbitration against RM with the London Court of International Arbitration (the "London Arbitration"). (*Id.* ¶ 178, Ex. 44.) Veleron is not a party to the arbitration. (*Id.* ¶ 179.)

Nonetheless, "through the London Arbitration [Veleron] discovered many of the facts underlying the claims alleged herein, including information regarding short sales by Morgan Stanley and that [Morgan Stanley and the Foreign Bank Defendants] were not actually 'Lenders' pursuant to the Credit Agreement." (*Id.*)

Veleron learned for example that the unnamed bank that had shorted Magna at the time of the acceleration notice was Morgan Stanley. (*Id.* ¶ 180.)

With respect to the second issue, Veleron alleges that BNP led Veleron to believe that Morgan Stanley and the Foreign Bank Defendants were Lenders under the Credit Agreement, with the attendant rights and obligations, through a pattern of "misleading representations and active concealment." (*Id.* ¶ 181.) This is relevant to Veleron's tortious interference claims, which are asserted against all defendants.

According to Veleron, during the London Arbitration, "BNP took actions to prevent Russian Machines and Veleron from learning the true nature of [its] arrangement with [Morgan Stanley and the Bank Defendants]." (*Id.* ¶ 182.) On December 10, 2010, BNP disclosed for the first time that it had entered into multiple derivative transactions with four other financial institutions, but opposed requests by RM for disclosure of those agreements. (*Id.*) On October 5, 2011, BNP provided a one-page statement explaining the nature of its relationship with the

Morgan Stanley and the Foreign Bank Defendants. (*Id.*) BNP disclosed its contracts with these defendants on or about May 4, 2012. (*Id.* ¶ 183.)

As noted above, Veleron contends that these contracts demonstrated that BNP had permitted Morgan Stanley and the Foreign Bank Defendants to direct its voting rights under the Credit Agreement. (*Id.*)

## IV.   Procedural History

Veleron commenced this lawsuit on August 3, 2012.

Following an initial pretrial conference on September 21, 2012, the Clifford Chance Defendants and Morgan Stanley made a motion to stay this case pending the outcome of the London Arbitration.   I denied that motion on October 12, 2012.

On November 16, 2012, the Clifford Chance Defendants and Morgan Stanley moved to dismiss Veleron's complaint.  On November 19 and 20, certain additional defendants were voluntarily dismissed from this action without prejudice.

On December 7, 2012, before the motions to dismiss could be resolved, Veleron filed the FAC.  It alleges the following causes of action:

- Count 1:  breach of contract against BNP (Credit Agreement);
- Count 2:  tortious interference with contract against Morgan Stanley and the Foreign Bank Defendants (Credit Agreement);
- Count 3:  breach of contract against BNP (Pledge Agreement);
- Count 4:  breach of contract against Morgan Stanley (Pledge Agreement and Agency Disposal Agreement);
- Count 5:  breach of contract against BNP (Forbearance Agreement);
- Count 6:  promissory estoppel against BNP (forbearance);

- Count 7: tortious interference with contract against Morgan Stanley (Forbearance Agreement);

- Count 8: tortious interference with prospective economic advantage against all defendants (Veleron's relationship with Magna); and

- Count 9: Securities Exchange Act of 1934 Section 10(b) and Rule 10b-5 violations against Morgan Stanley.

The Clifford Chance Defendants and Morgan Stanley moved to dismiss the FAC on January 18, 2013. The Clifford Chance Defendants have moved to dismiss on the grounds of *forum non conveniens* and on Rule 12(b)(6) grounds. Nexgen has moved separately for dismissal for lack of personal jurisdiction. Morgan Stanley has moved to dismiss on Rule 12(b)(6) grounds.

## DISCUSSION

### Morgan Stanley's Motion to Dismiss

### I.     Morgan Stanley's Motion to Dismiss Count 9 is Denied

Veleron's only federal claim is brought against Morgan Stanley under Section 10(b) of the Securities Exchange Act of 1934 and the accompanying regulation Rule 10b-5. Veleron brings this claim on two separate theories: insider trading and market manipulation. We need address only the first.

### A.     Standard of Review

Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 declares it unlawful

23

"(a) To employ any device, scheme, or artifice to defraud . . . or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. The Supreme Court has recognized that Section 10(b) "affords a right of action to purchasers or sellers of securities injured by its violation." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007).

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). In addition, "To establish liability under [Section] 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks omitted). With respect to scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

However, even under these heightened pleading standards, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all reasonable inferences are drawn in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir.2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir.2007). To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels

24

and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted).

In deciding a motion to dismiss, a court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991)); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996).

## B.   The Misappropriation Theory of Insider Trading

Though Veleron does not specifically use the term "misappropriation" in the FAC, it is nonetheless evident from the pleading that Veleron's insider trading claim against Morgan Stanley is premised on the theory of misappropriation. "[T]o make out a claim of insider trading based on [the misappropriation theory], a plaintiff must establish (1) that the defendant possessed material, nonpublic information; (2) which he had a duty to keep confidential; and (3) that the defendant breached his duty by acting on or revealing the information in question." *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 541 (S.D.N.Y. 2009) (citing *United States v. Falcone*, 257 F.3d 226, 232–33 (2d Cir. 2001)).   Veleron does not (and could not) argue the so-called "classical" theory of insider trading – i.e., where a corporate insider such as the CEO trades in the securities of his company on the basis of material, nonpublic information. *See United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).

"Under the misappropriation theory [of insider trading], which is the relevant theory here, a person commits fraud in connection with a securities transaction 'when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to *the source of*

25

the information.'" *Lyon*, 605 F. Supp. 2d at 541 (quoting *O'Hagan*, 521 U.S. at 652) (emphasis added). "[T]he misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *O'Hagan*, 521 U.S. at 652. The misappropriation theory also encompasses relationships of trust and confidence akin to a fiduciary duty. *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991); *see also* 17 C.F.R. § 240.10b5-2(b)(2).

In *Tellabs*, 551 U.S. at 323-24 (emphasis added) (internal citation and quotation marks omitted), the Supreme Court articulated the relevant standard for determining whether a plaintiff has sufficiently pleaded scienter – i.e., a mental state embracing intent to deceive, manipulate, or defraud – for the purposes of a securities fraud claim:

> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the most plausible of competing inferences. . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" – it must be cogent and compelling, thus strong in light of other explanations. *A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.*

The Second Circuit has articulated that a strong inference may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 527 (S.D.N.Y. 2009) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)) *aff'd sub nom.*, *Condra v. PXRE Grp. Ltd.*, 357 F. Appx. 393 (2d Cir. 2009); *see also Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001) ("[B]oth options for demonstrating scienter . . . survive the

PSLRA."). "[T]he inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud . . . [or] (2) engaged in deliberately illegal behavior." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). However, per *Tellabs*, any such inferences must still be both "cogent" and "at least as compelling" as any non-culpable inference that the defendant suggests could be drawn from the facts. *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008)

### i.    Veleron's Allegations

The FAC alleges, if barely and inelegantly, the following:

(1) Morgan Stanley possessed, and leaked to third parties, material, nonpublic information regarding BNP's margin calls to Veleron; Veleron's request for forbearance and efforts to restructure the Loan; BNP's decision not to forbear and to dispose of the Pledged Collateral; and the impending ABB, in which Veleron's large block of Magna shares would be liquidated and used to pay back some of Veleron's loan. Morgan Stanley also knew about the timing of all of the above; indeed, it arguably controlled the timing, in its capacity as disposal agent.

(2) This information was material. "[T]here [was] a substantial likelihood that a reasonable investor [in making an investment decision] would find it important" that a large investor in Magna (i.e., Veleron) had defaulted on its loan and, as a result, a substantial chunk of Magna stock was going to be sold off to satisfy the large investor's debt. *United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012). Such information could reasonably be expected to have an impact on the price of Magna stock.

(3) The information described above was also nonpublic, at least at the time that Morgan Stanley shorted Magna. Indeed, BNP, as Veleron's lender, was under a duty to Veleron, by

27

virtue of the Credit Agreement, to "keep confidential any information obtained in relation to the [Credit Agreement]." (Credit Agreement §14.12.)

(4) Morgan Stanley also had a duty to keep that information confidential. BNP was permitted to disclose to third parties information obtained in relation to the Credit Agreement to the extent necessary for BNP to perform its obligations under the Credit Agreement. (*See id.* §14.12(1)(a).) However, in the event that such disclosure became necessary, BNP was required to have the third party execute a confidentiality and nondisclosure agreement "for the benefit of . . . and in form and substance reasonably satisfactory to [Veleron] in advance of receiving such information." (*See id.*)

Though the FAC does not explicitly state from whom Morgan Stanley received the material, nonpublic information at issue, I assume, for the purposes of this motion, that Morgan Stanley's source was BNP, for whom it would act as agent in disposing of the shares. Assuming further that BNP kept its contractual obligation, Morgan Stanley should have signed a confidentiality agreement when it became BNP's disposal agent, or at the latest when BNP transmitted confidential information concerning the events of late September and early October 2008. Whether it actually did so is not a matter to be determined on a motion to dismiss; I will assume – again, for the purposes of this motion – that Morgan Stanley did sign such an agreement. Accordingly, Morgan Stanley owed BNP a duty to keep confidential information about the BNP/Veleron Credit Agreement (including the disposition of the collateral for the Loan evidenced in that agreement).

(5) Morgan Stanley acted on the material, nonpublic information by shorting Magna in the days before the ABB, and then selling in the aftermarket, which netted it a profit of $4 million. This is no different than if Morgan Stanley knew that a firm client was going to make a

28

big negative announcement in 24 hours and decided to dump shares of that client's stock.
Morgan Stanley, knowing of an important announcement about Veleron's substantial stake in
Magna, shorted Magna.  Furthermore, Morgan Stanley passed on the information to others, who
took out short positions themselves, though Veleron does not allege the timing of these trades.
(*See* FAC ¶¶ 145, 257.)

Morgan Stanley's argument that the sale of Veleron's Magna shares was not necessarily
"imminent" when it took out its short positions is hardly an issue that can be resolved on a
motion to dismiss.  However, the FAC pleads that Morgan Stanley took the positions in the three
days prior to the date the ABB actually took place, and that Morgan Stanley was instrumental in
causing BNP to decide to pull the plug on the Loan.  Also, it is a fair inference that, as the
disposal agent, Morgan Stanley had considerable control over when the ABB would take place.

(6) Veleron has satisfied the pleading standard for scienter.

With respect to motive, Veleron alleges that Morgan Stanley's conduct was guided by its
"facing a liquidity crisis . . . and [being] under significant pressure to generate cash wherever
possible." (FAC ¶ 119; *see also id.* ¶ 90.)  In essence, Morgan Stanley's motive to engage in
insider trading was that it needed cash quickly, especially in the wake of the collapse of Lehman
Brothers, and, due to its unique dual position as BNP's derivative counterparty and disposal
agent, as well as the execution of RM's Guarantee, Morgan Stanley bore no financial risk in
taking out short positions in Magna on the basis of material, nonpublic information.

In response, Morgan Stanley argues that "the desire to raise capital" is too "generalized"
a motive to support a strong inference of scienter.  (MS's Support Memo. at 32.)  While there is
substantial case law supporting this proposition in the context of a Section 10(b) securities fraud
claim based on a material misrepresentation or omission, *see, e.g., In re PXRE Grp.*, 600 F.

Supp. 2d at 532-33 (collecting cases), Morgan Stanley cites no such case in the context of a Section 10(b) insider trading claim. Indeed, "the Second Circuit has cited insider trading as the classic example of a 'concrete and personal' benefit that suffices to plead motive to commit securities fraud." *Id.* at 530-31 (citing *Novak*, 215 F.3d at 308).

With respect to opportunity, Veleron argues that Morgan Stanley had the opportunity to engage in insider trading, because (1) BNP allowed Morgan Stanley to direct BNP's voting rights under the Credit Agreement and (2) Morgan Stanley had "immense control" over the timing of the disposal, the method of disposal, and the price of the shares sold in the disposal. (Veleron's Opp'n at 45.) Morgan Stanley makes no counterargument with respect to opportunity, and thus it is deemed to concede this point at the pleading stage.

With respect to conscious misbehavior, Veleron alleges that Morgan Stanley engaged in "unlawful" short selling on the basis of the material, nonpublic information described above. (FAC ¶ 258.) "Such [deliberate] unlawful activity has been held, in and of itself, to be highly probative of scienter." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 820 (S.D.N.Y. 2006) (citing *In re Initial Pub. Offering, In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 384-85 (S.D.N.Y. 2003)).

Morgan Stanley focuses its argument on how Veleron cannot prove recklessness. However, as Veleron points out, shorting stocks does not happen recklessly; it only happens intentionally. *Cf. In re Initial Pub. Offering*, 241 F. Supp. 2d at 385.

With respect to the timing of Morgan Stanley's trades, Veleron cogently pleads that Morgan Stanley's short trades corresponded neatly with a series of significant events in the days leading up to the ABB, which further demonstrates Morgan Stanley's alleged scienter. *See, e.g., CompuDyne*, 453 F. Supp. 2d at 820; *Nanopierce Technologies, Inc. v. Southridge Capital*

30

*Mgmt. LLC.*, No. 02 Civ. 0767, 2002 WL 31819207, at *8 (S.D.N.Y. Oct. 10, 2002). BNP

issued the First Margin Call on September 29, 2008; Morgan Stanley established its first short

position the next day. On September 30, BNP issued the Second Margin Call and informed

Morgan Stanley and the Bank Defendants that Veleron was requesting a waiver of the margin

call requirements and a forbearance with respect to BNP's exercising its rights in exchange for a

guarantee from a BasEl entity; the next day, Morgan Stanley established its second short

position. Finally, on October 1, the deadline for the First and Second Margin Calls elapsed

without payment from Veleron and BNP sent RM the execution version of the Guarantee;

Morgan Stanley established its third short position on October 2.

Finally, many of Morgan Stanley's *Tellabs* contentions with respect to what is the more

cogent and compelling explanation for its conduct (i.e., opposing inferences) come across like a

closing argument to a jury. (*See, e.g.,* MS's Support Memo. at 29-30.) In other words, in

arguing so vehemently that "taking short positions based on possible waiver or forbearance

makes no economic sense, and certainly could not have resulted in 'risk-free' profits," (MS's

Reply at 17), Morgan Stanley appears to already be several steps down the road of this litigation.

Morgan Stanley repeatedly asserts its *theory* of the case, rather than drawing inferences about

scienter "*from the facts alleged.*" *Tellabs*, 551 U.S. at 324 (emphasis added). The purpose of a

motion to dismiss is to test the sufficiency of the allegations in the plaintiff's complaint, not to

grandstand, prior to discovery, about what it all means.

In any event, Morgan Stanley's explanation – namely, that the market went into freefall

in 2008, causing Magna's share price to plummet and, ultimately, all the parties exposed to the

Loan to act to protect themselves (appropriately) – is not a more cogent and compelling

explanation that that provided by Veleron -- at least not at this stage in the proceedings.

31

### ii.   Morgan Stanley's Remaining Counterarguments

At the outset it should be noted that, even though BNP, not Veleron, directed the sale of Veleron's shares, Veleron was nonetheless a seller of securities for the purposes of establishing standing to sue under Section 10(b). The Second Circuit has recognized that "defaulting pledgors . . . with only a partial right to the proceeds of the sale of their stock, [have standing] to sue as 'sellers' under Rule 10b-5 when their stock is sold to pay off the loan against which the stock was pledged." *Madison Consultants v. Fed. Deposit Ins. Corp.*, 710 F.2d 57, 61 (2d Cir. 1983); *see also Dopp v. Franklin Nat. Bank*, 374 F. Supp. 904, 909 (S.D.N.Y. 1974).

It is also of no moment that BNP represented and warranted in the Agency Disposal Agreement that, at the time of disposal, it would not have "any material information regarding [Magna] or its securities that is not public information the possession of which affects its ability to dispose of the Specified Securities in accordance with applicable law and regulation." (Agency Disposal Agreement § 7(c).)  There is no allegation in the FAC that BNP possessed material, nonpublic information about Magna that affected in any way its ability to dispose of the Pledged Collateral.  Furthermore, it would be absurd to argue that the material, nonpublic information at issue here – which is information about BNP's intent to dispose of the shares and how it planned to do it – somehow prevented BNP from disposing of the shares.

I disagree that Veleron has failed to  plead its claim with enough particularity to satisfy Rule 9(b) and the PSLRA.

Morgan Stanley's particularity argument is directed primarily at Veleron's description of the material, nonpublic information at issue and the details of Morgan Stanley's alleged leaks to third parties.  The FAC contains ample detail about the nature of the information at issue – i.e., BNP's margin calls, the status of forbearance and restructuring negotiations, and the potential

disposal of the Magna Class A Shares.  And in light of the fact that Morgan Stanley has never provided Veleron with the names of the 400 institutional investors Morgan Stanley to whom reached out ahead of the ABB, or the 46 such investors who actually participated in the ABB, it is difficult to see how Veleron could be any more specific in its allegations.

Morgan Stanley also argues that, because the information came from BNP, and not from Veleron, Veleron was not the party harmed by any misappropriation and therefore lacks standing to sue.  But the duty of confidentiality arose because Morgan Stanley was retained as BNP's agent to dispose of Veleron's Magna Class A Shares.  Veleron was indeed harmed by any misuse of confidential information relating to that disposition; Veleron alleges that shorting the stock depressed the price at which the ABB took place, leaving it a greater deficiency.  (FAC ¶ 258.) Furthermore, BNP owed Veleron a duty of confidentiality per the Credit Agreement, and so had the right of exclusive use of the information.  Morgan Stanley, BNP's agent, stands in the shoes of a tippee, who is liable as a principal if he trades on material, nonpublic information for his own account.  That is what is alleged here.

To the extent this case presents an intermediary-as-source scenario, as in *S.E.C. v. Lyon*, 605 F. Supp. 2d 531 (S.D.N.Y. 2009), BNP was the intermediary between Morgan Stanley and Veleron, not Magna (Magna is irrelevant, except that it is Magna's stock that is at issue).  BNP had a duty to Veleron; if BNP did what it was supposed to do and got Morgan Stanley to sign a confidentiality agreement, then Morgan Stanley had a duty to BNP (and incidentally to Veleron). On this basis, *Lyon* applies and Veleron has adequately pleaded the required duty of confidentiality and breach thereof.  *See Lyon*, 605 F. Supp. 2d at 546 ("As long as the SEC can establish that defendants owed a duty to the intermediary, liability under the misappropriation

theory is still possible as a matter of law.") (citing *S.E.C. v. Talbot*, 530 F.3d 1085, 1093 (9th Cir. 2008)).

*    *    *

In sum, Veleron has adequately alleged all of the elements of a misappropriation claim; none of Morgan Stanley's counterarguments has persuaded me otherwise. Accordingly, Morgan Stanley's motion to dismiss Count 9 of the FAC is DENIED.

Because the FAC can be sustained on Veleron's insider trading claim, I need not decide whether Veleron has pleaded Section 10(b) liability under a market manipulation theory.

## II.     Count 4 is Dismissed

Veleron alleges in Count 4 that Morgan Stanley is liable for breaching both the Pledge Agreement – to which Veleron and BNP are parties, but Morgan Stanley is not – and the Agency Disposal Agreement – to which Morgan Stanley and BNP are parties, but Veleron is not. In particular, Veleron alleges that, because the Agency Disposal Agreement incorporates by reference the Pledge Agreement, Morgan Stanley became BNP's "nominee" under the Pledge Agreement and thus was bound by that agreement. Veleron alleges further that BNP and Morgan Stanley intended Veleron to be a third-party beneficiary of the Agency Disposal Agreement and therefore it has standing to enforce the agreement against Morgan Stanley.

### A.     The Pledge Agreement is Not Incorporated by Reference into the Agency Disposal Agreement

It goes without saying that a defendant cannot breach a contract to which he is not a party. However, as a general matter, "Parties to a contract are plainly free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements to

34

which they are not party." *Ronan Associates, Inc. v. Local 94-94A-94B, Int'l Union of Operating Engineers, AFL-CIO*, 24 F.3d 447, 449 (2d Cir. 1994).

Under New York law, a written instrument is incorporated by reference into another agreement where (1) references to and/or descriptions of the instrument in the agreement allow the instrument to be identified beyond all reasonable doubt and (2) it is clear that the parties to the agreement knew of and consented to the incorporation of the instrument. *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996); *Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.*, 429 F. Supp. 2d 582, 602 (S.D.N.Y. 2006). "[T]he mere fact that a contract refers to another contract does not mean that it has 'incorporated' the other contract." *Rosen v. Mega Bloks Inc.*, No. 06 Civ. 3474, 2007 WL 1958968, at *10 (S.D.N.Y. July 6, 2007) (citing *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 666 (7th Cir. 2002)), *report and recommendation adopted in pertinent part*, 2008 WL 2810208 (S.D.N.Y. July 21, 2008).

Here, there are effectively two references to the Pledge Agreement in the Agency Disposal Agreement. As a matter of law, neither of these references clearly evinces the necessary intent to find that the Pledge Agreement was incorporated by reference into the Agency Disposal Agreement.

First, there are references to the Pledge Agreement in the Agency Disposal Agreement's "whereas" recital clauses. Clause (B) acknowledges that, under the Pledge Agreement, Veleron granted BNP security in the Magna Class A Shares. Clause (C) provides that "pursuant to . . . the Pledge Agreement, *[BNP] is entitled*, in the event the security constituted therein becomes enforceable, to instruct its agent to dispose of part or all of the [Pledged Collateral] and to apply the proceeds from such disposal(s) to discharge [Veleron's] obligations arising under . . . the [Credit Agreement]." (Emphasis added.) Finally, clause (D) provides that the Pledge

Agreement "confirms the basis upon which *[BNP]* has, *pursuant to its rights* under the Pledge

Agreement, engaged Morgan Stanley . . . to act as [BNP's] agent in respect of certain disposals

of the [Pledged Collateral] by [BNP]."  (Emphasis added.)

I agree with Morgan Stanley that these clauses do no more than recite *BNP's* rights under

the Pledge Agreement, and in no way manifest any intent that those rights (or BNP's obligations)

were to be extended to Morgan Stanley.  No other reading of the clauses is tenable.

Second, Section 2 of the Agency Disposal Agreement provides that "Morgan Stanley

acknowledges that *[BNP], in enforcing its security under the Pledge Agreement, is obligated* to

seek the best price available in the market for transactions of a similar size and nature at the time

of sale, and Morgan Stanley agrees to use all reasonable [efforts] to comply with such terms."

(Emphasis added.)

Here, too, the Agency Disposal Agreement merely refers to *BNP's* obligations under the

Pledge Agreement, and does not demonstrate the requisite intent that Morgan Stanley also be

bound by that agreement.  Morgan Stanley's sole obligation stemming from the above-quoted

provision is imposed by *the Agency Disposal Agreement itself*, not the Pledge Agreement.  The

Agency Disposal Agreement obligates Morgan Stanley to use all reasonable efforts to comply

with *BNP's* obligation under the Pledge Agreement to seek the best price available in the market

in the event of a sale of the Pledged Collateral.  In other words, the Agency Disposal Agreement

creates a duty on Morgan Stanley's part to assist BNP in executing its duty under the Pledge

Agreement.  That Morgan Stanley's duty is complementary to or contingent upon BNP's duty

does not mean that the document imposing that obligation on BNP was incorporated by reference

into the document imposing obligations on Morgan Stanley.

36

The Court also notes that the Agency Disposal Agreement contains a merger clause that provides that "This Agreement constitutes the whole and only agreement between [BNP] and Morgan Stanley in relation to the Engagement." (Agency Disposal Agreement § 13.) There is no mention of the Pledge Agreement in the merger clause – which is further proof that the Agency Disposal Agreement was not intended to incorporate the Pledge Agreement by reference.

Veleron argues that the fact that Section 4.1 of the Pledge Agreement speaks to the limited liability of BNP and "any nominee on its behalf" (i.e., Morgan Stanley) is evidence that the Pledge Agreement was incorporated by reference into the Agency Disposal Agreement. The term "nominee" is not defined in the Pledge Agreement, nor is Morgan Stanley explicitly mentioned in the agreement. Nothing in the FAC or the exhibits appended thereto, other than Veleron's bare allegation, suggests that Morgan Stanley was a nominee. Assuming *arguendo* that Morgan Stanley did eventually become BNP's nominee, it did not do so until it became BNP's disposal agent on January 31, 2008, several months after the execution of the Pledge Agreement. In any event, Morgan Stanley cannot be bound by an agreement to which it was not a party simply because that agreement mentions BNP's potential nominees.

In sum, I find, as a matter of law, that nothing in the Agency Disposal Agreement evinces a clear intent on the behalf of BNP and Morgan Stanley, the parties to that agreement, to incorporate by reference the Pledge Agreement, to which Morgan Stanley is not a party. Accordingly, Morgan Stanley was not bound by the Pledge Agreement and could not have breached it.

**B.      Veleron is Not a Third-Party Beneficiary of the Agency Disposal Agreement**

Only the parties to a contract, or intended third-party beneficiaries, have standing to sue

for breach of contract. *See Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir.

2009).

Under New York law, a third-party beneficiary claim will survive a motion to dismiss if

the plaintiff alleges the following:  "(1) the existence of a valid and binding contract between

other parties, (2) that the contract was intended for [the plaintiff's] benefit, and (3) that the

benefit to [the plaintiff] is sufficiently immediate to indicate the assumption by the contracting

parties of a duty to compensate [the plaintiff] if the benefit is lost." *Mandarin Trading Ltd. v.*

*Wildenstein*, 16 N.Y.3d 173, 182 (2011).   An agreement that confers only an incidental benefit

on the plaintiff will not suffice. *Bayerische Landesbank, New York Branch v. Aladdin Capital*

*Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012).   While "the obligation to the third-party beneficiary

need not be explicitly stated," *M Sports Prods. v. Pay-Per-View Network, Inc.*, 97 Civ. 6451,

1998 WL 19998, at *2 (S.D.N.Y. Jan. 20, 1998), "the parties' intention to benefit the third party

must [nonetheless] appear from the four corners of the instrument." *Debary v. Harrah's*

*Operating Co., Inc.*, 465 F. Supp. 2d 250, 267 (S.D.N.Y. 2006) (internal quotation marks

omitted), *aff'd sub nom., Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115 (2d Cir.

2008).  However, "it is permissible for the court to look at the surrounding circumstances as well

as . . . the agreement." *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 275 (S.D.N.Y. 2009) (citing

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir.1991)).

Still, "The terms contained in the contract must *clearly evince* an intention to benefit the third

person who seeks the protection of the contractual provisions." *Debary*, 465 F. Supp. 2d at 267

(emphasis added) (internal quotation marks omitted).

Here, there was plainly a valid and binding contract between BNP and Morgan Stanley: the Agency Disposal Agreement. While Veleron acknowledges that that agreement "does not expressly specify that Veleron is a third party beneficiary thereof," (FAC ¶ 78), it argues that the Court can infer from "the nature" of the agreement that Veleron was a direct and intended third-party beneficiary of that agreement, (id.), because "any disposal of the Pledged Collateral pursuant to the Agency Disposal Agreement would reduce Veleron's Loan obligations and any deficiency that Veleron could be required to pay." (FAC ¶ 221.) In support of this argument, Veleron cites recital clause (C) of the Agency Disposal Agreement, which provides that, after a disposal of the Pledged Collateral, "[BNP] is entitled . . . to apply the proceeds from such disposal(s) to discharge [Veleron's] obligations arising under . . . the [Credit Agreement]."

Veleron also argues that Section 2 of the Agency Disposal Agreement -- which obligates BNP and Morgan Stanley to use reasonable efforts "to seek the best price available in the market for transactions of a similar size and nature at the time of sale" – conferred a direct benefit on it "by ensuring that its obligations under the Credit Agreement were reduced to the maximum extent possible." (Veleron's Opp'n at 75-76; see also FAC ¶ 78.)

Finally, Veleron urges the Court to consider the "surrounding circumstances" in determining whether it was an intended third-party beneficiary of the Agency Disposal Agreement. Specifically, Veleron argues that the "Pledge Agreement allows BNP to enter an agreement with a nominee to dispose of the Pledged Collateral, the proceeds of which would then be used to reduce Veleron's obligations under the Credit Agreement." (Veleron's Opp'n at 76 (citing Pledge Agreement § 4.6).)

None of these argument has the slightest persuasive force. At best, recital clause (C), Section 2, and the surrounding circumstances demonstrate that Veleron stood to benefit

39

incidentally from a successful disposal of the Pledged Collateral, because those proceeds would go toward reducing Veleron's obligations under the Credit Agreement. How beneficial this actually was to Veleron is itself debatable, since what would have truly benefited Veleron was holding onto the Magna Class A Shares. Indeed, that is ultimately what this case is all about – the money that Veleron allegedly could have made if had it not defaulted on the Loan and the shares had not been sold when and how they were. For the purposes of this motion, however, I deem Veleron to have adequately alleged a sufficiently "immediate" benefit under the Agency Disposal Agreement.

But Veleron has conflated the benefit prong of the *Mandarin Trading* test with the intent prong. Just because Veleron stood to benefit incidentally from a successful disposal of the Pledged Collateral does not mean that it was *intended* to be a third-party beneficiary with the right to enforce an agreement to which it was not a party. Indeed, Veleron has pointed to no provision of the Agency Disposal Agreement (or to any surrounding circumstances) that clearly evinces that it was BNP and Morgan Stanley's *intent*, in entering into that agreement, to confer such a benefit upon Veleron. To the contrary, the Agency Disposal Agreement contains a number of provisions that have been found by courts in this Circuit to evince an intent *not* to confer third-party beneficiary status – even though the Agency Disposal Agreement does not explicitly disclaim third-party beneficiaries.

Section 12 of the Agency Disposal Agreement contains an inurement clause, which provides that "This Agreement shall be binding upon and enure [sic] to the benefit of each party to this Agreement and its or any subsequent successors and assigns." Section 12 also contains an anti-assignment clause, which provides that "No party to this Agreement may assign or transfer

or purport to assign or transfer a right or obligation under this Agreement except with the prior

written consent of the other party to this Agreement."

   In *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 164 (S.D.N.Y. 1998),

my colleague Judge Kaplan held that the existence of an inurement clause and an anti-

assignment clause[8] in a contract "suggest[s] that the parties did not intend that third parties

benefit from the contract.  Language specifying that the benefit of a contract is to inure to the

contract's signatories arguably is superfluous unless it serves to limit the category of

beneficiaries."  I agree.

   Additionally, the Agency Disposal Agreement contains a merger clause.  (Agency

Disposal Agreement § 13.)  Such clauses have been held repeatedly to undermine any inference

that the parties intended to confer benefits on a non-party.  *See, e.g., BNP Paribas Mortgage

Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 410 (S.D.N.Y. 2011*)*; *Debary*, 465 F. Supp. 2d

at 267.

   In sum, I find, as a matter of law, that Veleron was not an intended third-party

beneficiary of the Agency Disposal Agreement.  Accordingly, Veleron has no standing to sue

Morgan Stanley for a breach of that agreement.[9]

*          *          *

---

[8] Both of these provisions were very similar to those at issue here: "This Agreement is of a personal nature with
respect to [Jeanswear] and, therefore, except as provided below, neither this Agreement nor the license or other
rights granted hereunder may be sublicensed, assigned or transferred by [Jeanswear] except with [CKI's] prior
written consent. . . .Except as otherwise provided herein, this Agreement shall inure to the benefit of and shall be
binding upon the parties and permitted successors and assigns."  *Piccoli*, 19 F. Supp. 2d at 163.

[9] Morgan Stanley seems to think that Veleron is seeking the commission or fee that Morgan Stanley received
pursuant to Agency Disposal Agreement as a result of the ABB.  (*See* MS's Support Memo. at 41-42.)  While
Veleron does suggest in the FAC that Morgan Stanley's commission was excessive, that allegation does not appear
to underpin any of its causes of action against Morgan Stanley.  In any event, Veleron lacks standing to assert such a
claim for all of the reasons set forth above.

On the basis of the foregoing, Morgan Stanley's motion to dismiss Count 4 of the FAC is GRANTED.

**III.    Counts 2, 7, and 8 are Dismissed as Against Morgan Stanley**

Veleron alleges that Morgan Stanley tortiously interfered with (1) the Credit Agreement (Count 2), (2) the Forbearance Agreement (Count 7), and (3) Veleron's relationship with Magna under a theory of tortious interference with prospective economic advantage (Count 8). Without briefing the choice-of-law issue, Morgan Stanley and Veleron proceed as though New York law applies to Veleron's tortious interference claims against Morgan Stanley. The Court sees no reason to disturb the parties' agreement in light of the fact that Morgan Stanley is based in New York – especially since, if New York law applies, the claims must be dismissed.

Under New York law, all of these claims are governed by a three-year statute of limitations. *See* C.P.L.R. § 214[4]; *see also D'Andrea v. Rafla-Demetrious*, 3 F. Supp. 2d 239, 248 n. 8 (E.D.N.Y. 1996) *aff'd*, 146 F.3d 63 (2d Cir. 1998). Veleron's claims accrued on the date it sustained its injury – not from the date of Morgan Stanley's alleged wrongful conduct or the date Veleron discovered its injury. *See Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993); *see also D'Andrea*, 3 F. Supp. 2d at 248 n. 8.

Here, Veleron's injury accrued in early October 2008, when BNP directed Morgan Stanley to sell the Pledged Collateral and Morgan Stanley executed that sale through the ABB. (*See* FAC ¶¶ 148, 184-87, 243-45.) At that point, BNP is alleged to have impermissibly allowed Morgan Stanley (along with the Foreign Bank Defendants) to direct its voting rights under the Credit Agreement (*see id.* ¶¶ 204-08), Veleron lost the benefit of the Forbearance Agreement (*see id.* ¶¶ 243-45), and its strategic investment in Magna came to an end. (*See* Polkes Decl., Ex. B; FAC ¶¶ 156, 247-48.)

42

However, Veleron did not bring this action until August 2012 – nearly four years after its claims had accrued.

Veleron does not contest that its claims accrued in October 2008 or that it brought this suit after the three-year limitations period had elapsed. Instead, it argues that the statute of limitations should be tolled under the doctrine of equitable estoppel. In particular, Veleron contends that, through "numerous fraudulent acts and misrepresentations," Morgan Stanley (along with the Foreign Bank Defendants) "effectively concealed" its "true status as [a] 'Participant[]' as opposed to [a] 'Lender[].'" (Veleron's Opp'n at 86.) Veleron appears to argue that, if it had not been deceived into believing that Morgan Stanley was a Lender, it would have filed a timely action against Morgan Stanley on the basis of its controlling BNP's decision with respect to the disposal of the Pledged Collateral. But even if it were true that Veleron was so deceived, it would not result in an equitable toll.

Under New York law, the doctrine of equitable estoppel applies "where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action. Moreover, the plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations." *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006) (internal citation and quotation marks omitted).

Even assuming *arguendo* that Veleron has adequately alleged that it was induced from filing a timely action by fraudulent acts and/or misrepresentations (*see, e.g.,* FAC ¶¶ 70, 181), the doctrine of equitable estoppel does not apply here. It does not apply because Veleron knew as long ago as October 14, 2008 (*see* FAC Ex. 35), if not earlier, that Morgan Stanley was the ABB disposal agent, so it knew about Morgan Stanley's involvement in the events that give rise to the claim soon after the ABB was completed.

43

Veleron also could not have reasonably believed that Morgan Stanley was a Lender under the Credit Agreement – no matter what it was told.

Veleron specifically alleges that Morgan Stanley did not execute the Assignment Agreement required for a third party to become a Lender under the Credit Agreement. (*See* FAC ¶¶ 67-68; *see also* Credit Agreement § 13.1(3)(b).) Veleron further alleges that it did not find out that no Assignment Agreements were executed until the arbitration in London had commenced. (FAC ¶ 181.) But, as noted above, this allegation is contradicted by the express terms of the Credit Agreement, which provides that an assignment becomes effective only upon its delivery *to Veleron* and BNP. (*See* Credit Agreement § 13.1(3)(b).) If Veleron received no signed Assignment Agreement from Morgan Stanley – which Veleron alleges is the case – it could not have reasonably believed that Morgan Stanley had become a Lender under the plain terms of the Credit Agreement.[10]

So there is no reason to toll the limitations period. Because Veleron's tortious interference claims were filed after the three-year limitations period had elapsed, Counts 2, 7, and 8 of the FAC are time-barred as against Morgan Stanley.

## The Clifford Chance Defendants' Motion to Dismiss

I. **The Clifford Chance Defendants' Motion to Dismiss on the Grounds of *Forum Non Coveniens* is Granted**

As stated at the outset, Clifford Chance represents the following defendants: BNP, Credit Suisse, Nexgen, and RBS.

---

[10] Reliance was unreasonable for a more basic reason –as a US company subject to US securities laws, Morgan Stanley was ineligible to become a Lender under the Credit Agreement. (*See* Credit Agreement § 1.1(40).) But I am not relying on this point because Morgan Stanley was equally ineligible to become a Participant, yet it appears to have been one (assuming that the holders of the hedges qualify as Participants in the Loan – which seems likely but is not entirely clear).

The claims against BNP are as follows:  (1) breach of the Credit Agreement by, *inter alia*, allowing Morgan Stanley and the Foreign Bank Defendants to direct its decision to dispose of the Pledged Collateral (Count 1); (2) breach of the Pledge Agreement by selling the Pledged Collateral in a private, as opposed to a public, sale when the Ontario securities laws did not prevent BNP from conducting a public sale (Count 3); and (3) breach of the asserted Forbearance Agreement by going forward with the ABB (Count 5).  The Credit and Pledge Agreements, and presumably the Forbearance Agreement (since it necessarily modified the other two) are governed by Ontario law.  Veleron also brings a promissory estoppel claim against BNP (Count 6), which may or may not be recognized by whatever law governs these events -- which is manifestly not the law of the state of New York, since both Veleron and BNP are foreign corporations, who negotiated and executed the agreements at issue outside of the United States, making them subject to the law of a foreign country – and with one of those Agreements, (the Credit Agreement) expressly precludes any U.S. connection (the Credit Agreement, see below). Finally, as discussed immediately below, Veleron brings a tortious interference with prospective business advantage claim against BNP, asserting that the sale of the Magna stock interfered with its investment in Magna (Count 8).

The tortious interference allegations against the Clifford Chance Defendants in Counts 2 and 8 are identical to the claims against Morgan Stanley that were dismissed on statute of limitations grounds. But it is hardly clear that the law of New York would govern any claim against these defendants; none of them is a US company. And while they sent payment for the credit derivative transactions to a BNP account in New York, and participated from their offices abroad in conference calls ahead of the ABB that included New York-based Morgan Stanley, those facts do not suggest that New York law applies to any claim arising out of actions these

45

defendants took from their offices in Dublin (Nexgen), Paris (Credit Suisse), and London (ABN) in connection with the credit derivative transasction (to which Veleron was not a party, and as to which – assuming, of course, that the banks are "Participants" as alleged – the Credit Agreement plainly states that Veleron has no rights against the Foreign Banks Defendants nor they any obligations to Veleron).

In any event, no one has bothered to brief the choice-of-law issue. And if they had, and I had reached the counterintuitive conclusion that New York law applied to these claims, they would have to be dismissed as time-barred!

All of the claims against the Clifford Chance Defendants can be adjudicated without adjudicating the Section 10(b) claim that is peculiar to Morgan Stanley. The securities fraud claim against Morgan Stanley and the claims against the Clifford Chance Defendants  are of course related, in that all of them grow out of BNP's loan to Veleron and the purchase of the Magna shares. And BNP, at least, is likely to be a witness in the securities fraud case, while Morgan Stanley will likely be a witness in both the London Arbitration and in Veleron's lawsuit against the Clifford Chance Defendants,

But the claims are not intertwined. They raise entirely discrete issues of both fact and law. Because there is no viable (i.e., non-time-barred) claim against Morgan Stanley that corresponds to the claims against any of the Clifford Chance Defendants, there is no economy whatever to litigating Veleron's claims against the Clifford Chance Defendants here in New York. Indeed, in their Credit Agreement, Veleron and BNP appear to have done everything in their power to keep any claim that might arise in right of this particular loan transaction out of a U.S. court.

The Court also notes that there is arguably no personal jurisdiction over Nexgen, one of the three Foreign Bank Defendants. Were I to determine that Nexgen was not subject to the jurisdiction of this court, it would make even less sense to litigate Veleron's claims against the Clifford Chance Defendants here in New York.[11]

The doctrine of *forum non conveniens* suggests that the claims against the Clifford Chance Defendants can and should be litigated elsewhere.

## A.      **Standard of Review**

The doctrine of *forum non conveniens* "is a discretionary device permitting a court in rare instances to 'dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim.'" *Wiwa v. Royal Dutch Petroleum Co.*, 226 F. 3d 88, 100 (2d Cir. 2000) (quoting *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F. 3d 65, 73 (2d Cir. 1998)). "In deciding where a trial should be held the central notions of the doctrine of *forum non conveniens* are the convenience of the parties and their witnesses and that justice be served." *USHA (India), LTD. v. Honeywell Int'l, Inc.*, 421 F. 3d 129, 134 (2d Cir. 2005).

In *Iragorri v. United Technologies Corp.*, 274 F. 3d 65 (2d Cir. 2001), the Second Circuit adopted a three-part test for analyzing motions to dismiss for *forum non conveniens. Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 451 (S.D.N.Y. 2008); *see also Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F. 3d 146, 153 (2d Cir. 2005); *DiRienzo v. Philip Services Corp.*, 294 F. 3d 21, 28 (2d Cir. 2002). "The defendant bears the burden to establish clearly each factor . . . and to demonstrate that the balance tilts strongly in favor of the purported alternative forum."

---

[11] Nexgen did make a motion to dismiss the complaint against it for lack of personal jurisdiction, but in view of my decision on the Clifford Chance Defendants' joint motion under *forum non conveniens*, it makes little sense to expend precious court time on the issue. Were this a close case, I would resolve the jurisdictional question, to see whether it had any impact on the *forum non conveniens* analysis. But the case is not really close.

*Cortec Corp. v. Erste Bank Ber Oesterreichischen Sparkassen AG (Erste Bank)*, 535 F. Supp. 2d

403, 407 (S.D.N.Y. 2008) (citing *PT United*, 138 F. 3d at 74).

"The first step in a *forum non conveniens* analysis is determining what level of deference

to accord a plaintiff's choice of forum." *Cortec Corp.*, 535 F. Supp. 2d at 407.  Second, the court

must consider whether an adequate alternative forum for the litigation exists. *Iragorri*, 274 F. 3d

at 73.  Third, if such an alternative forum exists, the court must weigh the relative convenience of

the forums by analyzing certain private and public interest factors. *Id.*

The Clifford Chance Defendants would prefer that this dispute be heard by the courts of

England.  As discussed herein, I agree that the courts of England (or Canada) are a more

appropriate forum for Veleron's claims against these defendants.

### i.  Level of Deference

The Second Circuit has established a "sliding scale" approach for district courts to use

when making a determination with respect to the level of deference due to a plaintiff's choice of

forum. *Iragorri*, 274 F. 3d at 71.  "Th[e] sliding scale encompasses considerations of forum

shopping and convenience and is evaluated under the totality of the circumstances." *Ramirez de*

*Arellano v. Starwood Hotels & Resorts Worldwide, Inc.*, 448 F. Supp. 2d 520, 525, (S.D.N.Y.

2006).  The Second Circuit has stated unequivocally that "a court should begin with the

assumption that a plaintiff's choice of forum will stand unless the defendant can demonstrate that

reasons exist to afford it less deference." *DiRienzo*, 294 F. 3d at 28 (citing *Iragorri*, 274 F. 3d at

70-71).

*Iragorri* identified factors that are relevant in determining whether a forum choice was

motivated by genuine convenience.  274 F. 3d at 72.  Those factors include: "the convenience of

the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence

to the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." *Id.* "[A] foreign plaintiff's choice [of forum] deserves less deference." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981); *see also Iragorri*, 274 F.3d at 71. However, as a general matter:

> The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.*

*Iragorri*, 274 F.3d at 71-72; *see also Bigio v. Coca-Cola Co.*, 448 F. 3d 176, 179 (2d Cir. 2006).

Circumstances commonly indicative of impermissible forum shopping include: "attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum." *Iragorri*, 274 F. 3d at 72.

A district court is not required to address every single factor in making its determination. *Norex Petroleum Ltd.*, 416 F. 3d at 155.

Here, the plaintiff is a special purpose investment vehicle organized under the laws of the Netherlands and wholly-owned by a Russian holding company. So Veleron's choice of this forum is automatically entitled to less deference. However, this does not end the inquiry; I must still determine (1) whether the claims against the foreign defendants have a bona fide connection to the United States and (2) whether considerations of convenience favor adjudicating the

contract claims against BNP in particular in the United States.[12] Having considered the factors weighing in favor of and against litigating Veleron's contract claims against BNP in this Court, I conclude that Veleron's choice of this forum is not entitled to any deference at all.

The case against trying Veleron's contract claims against BNP in this forum is simple but compelling. The agreements at issue (i.e., the Credit, Pledge, and Forbearance Agreements) were negotiated in Europe, entered into by European entities, are governed by foreign law, and were plainly structured to avoid the parties having to litigate in the United States. For example, there would be no reason to make U.S. companies ineligible for assignment/participation under the Credit Agreement if the parties' purpose were not to make sure that the agreement not be subject to US law or end up being adjudicated in a U.S. court. (*See* Credit Agreement § 1.1(40).) In other words, Veleron "did not have a reasonable expectation of a United States venue for claims arising out of" its agreements with BNP; to be quite clear, it had no such expectation at all. *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 260 (S.D.N.Y. 2011) (quoting *In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d 1305, 1343 (S.D. Fla. 2010) *aff'd sub nom. Inversiones Mar Octava Limitada v. Banco Santander S.A.*, 439 F. Appx 840 (11th Cir. 2011)).

In addition, due to the Clifford Chance Defendants' significant European operations, and the existence of the related London Arbitration, much of the relevant evidence and many of the relevant witnesses are located in Europe. (*See generally* Lefevre-Moulenq Nov. 16, 2012 Decl. (BNP); *see also* Staples Mar. 8, 2013 Decl. ¶¶ 5-6 (BNP); Collop Mar. 8, 2013 Decl. ¶¶ 4-6 (RBS); Sudhir Mar. 8, 2013 Decl. ¶¶ 5-6 (Credit Suisse); O'Connell Mar. 8, 2013 Decl. ¶¶ 5-6 (Nexgen).) It is true that Morgan Stanley will have witnesses whose testimony in the Veleron-

---

[12] As noted above, it is not clear to the Court that New York law applies to Veleron's tortious inference claims against the Clifford Chance Defendants.

BNP-Foreign Bank Defendant case will be needed, but it is a wealthy company with offices all over the world; testimony can be arranged. *See Cyberscan Tech., Inc. v. Sema Ltd.*, No. 06 Civ. 526, 2006 WL 3690651, at *10 (S.D.N.Y. Dec. 13, 2006); *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05 Civ. 9478, 2006 WL 3230301, at *6 (S.D.N.Y. Nov. 7, 2006).

I also see some merit in the Clifford Chance Defendants' suggestion that Veleron has selected this forum because the United States does not have "loser pays" attorneys' fees for the winner, whereas England does. That is precisely the sort of factor a court is supposed to consider in assessing *forum non conveniens*.[13]

Veleron suggests four reasons that it argues weigh in favor of litigating its contract claims against BNP in this Court. First, the ABB was conducted out of Morgan Stanley's Manhattan office. Second, Veleron brings a federal securities claim against Morgan Stanley that could not be heard outside of the United States. Third, the Agency Disposal agreement is governed by New York law and BNP and Morgan Stanley consented to this Court's jurisdiction with respect to any disputes arising out of that agreement. (Agency Disposal Agreement § 14.) Fourth, Veleron contends that dismissing the Clifford Chance Defendants from this action on the ground of *forum non conveniens* would result in an onerous split litigation, with some claims being heard here and some claims being heard in England.

With respect to the first reason, while it is true that one critical event in this litigation (the ABB) occurred in this district, Veleron's claims against BNP are based on its *contracts* with BNP, which have no particular connection to this district.

---

[13] By the same token, I cannot see how litigating in New York would give Veleron much advantage in the London Arbitration, unless the Clifford Chance Defendants are concerned that an American court's liberal discovery rules would somehow have a deleterious impact on the London proceeding, which is already fairly advanced.

With respect to the second reason, as discussed above, Veleron's sole surviving federal claim against Morgan Stanley only involves BNP as a witness (and the Foreign Bank Defendants not at all, as far as I can tell). The Section 10(b) claim against Morgan Stanley is essentially unrelated to Veleron's breach of contract claims against BNP. The courts of this country undoubtedly have an interest in enforcing US securities law, and so this Court is an appropriate forum for Veleron's claim of securities fraud. *DiRenzo*, 294 F.3d at 28. But the courts of this country do not have an overriding interest in resolving contract claims to which no American is a party, and which are governed by foreign law.

With respect to the third reason, having decided that Veleron has no standing to bring any claim under the Agency Disposal Agreement, it is irrelevant that that agreement is governed by New York law, and that BNP and Morgan Stanley consented to this Court's jurisdiction in connection with that agreement.

Finally, the Court is unmoved by the purportedly "onerous" split between a straightforward insider trading claim against a US company, one involving a discrete and finite set of facts, and a massive foreign contract litigation with multiple parties that raises no issues of U.S. law or policy. Veleron is already engaged in parallel litigation via RM's (Veleron's parent company) participation in the related London Arbitration. Moreover, Veleron brought the "division of actions" on itself by appending its case against the Clifford Chance Defendants to the entirely severable claim against Morgan Stanley.

In sum, Veleron's claims against the Clifford Chance Defendants do not have a *bona fide* connection to the United States, and adjudication of these claims here would be far less convenient than their adjudication in England. Thus, Veleron's choice of this forum is entitled to no deference.

### ii.   Existence of an Adequate Alternative Forum

The next step in the *forum non conveniens* analysis is determining whether an adequate alternative forum for the plaintiff's claims exists. *Norex Petroleum Ltd.*, 416 F. 3d at 160; *see also Iragorri*, 274 F. 3d at 73. "The defendants bear the burden of establishing the existence of an adequate alternative forum." *Maersk*, 554 F. Supp. 2d at 453; *see also USHA (India), Ltd. v. Honeywell Intl. Inc.*, 421 F.3d 129, 135 (2d Cir. 2005) (citing *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 476 (2d Cir.2002)). Generally, an adequate alternative forum exists if: "(1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Ramirez de Arellano*, 448 F. Supp. 2d at 527. "In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative." *Aguinda*, 303 F. 3d at 476-77 (quoting *Piper Aircraft*, 454 U.S. at 255 n. 22).

Here, the Clifford Chance Defendants assert that the courts of England are an adequate alternative forum for this dispute. In addition, all of the Clifford Chance Defendants consent to the English courts' jurisdiction.

While the courts of England would not be able to adjudicate Veleron's federal securities claim against Morgan Stanley, there is no reason the English courts would not able to adjudicate Veleron's claims against BNP and the other Clifford Chance Defendants (assuming the tortious interference claims are not time-barred there, as well). Moreover, Veleron does not argue that English courts would not be able to apply the law of whatever country governs these claims. English courts are presumably accustomed to applying the law of another Commonwealth nation (Canada), and should it prove the case that New York law governs the tortious interference claims against the Clifford Chance Defendants, this Court has already told the London court

53

what the answer is – the claims are time-barred. Veleron also does not argue that English courts would afford unsatisfactory remedies for the injuries Veleron alleges, whatever law might apply to plaintiff's claims.

Finally, having to litigate entirely different issues against different parties in two places – which I already found unconvincing vis-à-vis the deference analysis – has no bearing on the *adequacy* of the courts of England.

In sum, the Clifford Chance Defendants have satisfied their burden to demonstrate that the courts of England are an adequate alternative forum for this dispute.

### iii.   Private and Public Interest Factors

The final step in the *forum non conveniens* analysis is to balance the two groups of factors identified by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), namely, "the private interest factors reflecting the interests of the parties at bar and the public interest factors reflecting the interests of the public." *Ramirez*, 448 F. Supp. 2d at 528. The defendant has the burden to prove that *both* the private and public interest factors strongly favor dismissal. *Maersk*, 554 F. Supp. 2d at 453. I consider each in turn.

### a.   Private Interest Factors

The Supreme Court has stated that the following private interest factors are relevant to a district court's *forum non conveniens* analysis:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gilbert*, 330 U.S. at 508-09.

In arguing the private interests in this case, the parties essentially rehash their arguments with respect to the deference due to Veleron's choice of forum. I find that the private interest factors strongly weigh in favor of the Clifford Chance Defendants, for all of the same reasons that Veleron's forum choice does not deserve deference.

### b.      Public Interest Factors

The public interest factors to be assessed include: "(i) administrative difficulties caused by court congestion, (ii) the local interest in having localized controversies decided at home, (iii) the burden of jury duty on a community unrelated to the litigation, and (iv) the appropriateness of having a court familiar with the governing law adjudicate the dispute." *Ramirez*, 448 F. Supp. 2d at 530; *see also Gilbert* 330 U.S. at 508-09. Neither BNP nor Veleron directs its argument at the first and third factors.

The crux of the Clifford Chance Defendants' argument is that, because Veleron asserts no federal claims against them, this Court has no interest in deciding this dispute. I agree that the lack of any federal claim against the Clifford Chance Defendants divests this Court of any particular interest in Veleron's claims against these defendants. Moreover, the uncertainty surrounding whether New York (or, indeed, any state's) law applies to Veleron's tortious interference claims against the Clifford Chance Defendants also suggests that this New York-based Court lacks interest in resolving those claims.

The crux of Veleron's argument is that this case has significant "contacts" with New York. While I recognize that a critical event in this litigation (the ABB) occurred in New York, Veleron's claims against BNP still sound primarily in contracts that have *no connection* to New York or the United States generally, and that were drafted in order to get around U.S. law and U.S. courts by making it literally impossible for any entity subject to US law to be a party

55

thereto. That fact trumps all others. There is no local interest in resolving a dispute with respect to such a transaction.

Finally, this Court is less expert in interpreting and applying Ontario law than are the courts in England; both Canada and England are Commonwealth countries, while the United States has diverged more greatly from our ancestral legal relationship.

Accordingly, I find that the public interest factors also weigh strongly in favor of Veleron's claims against the Clifford Chance Defendants being heard in the courts of England.

*     *     *

In conclusion, all of the *forum non conveniens* factors weigh strongly in favor of dismissing Veleron's claims against the Clifford Chance Defendants so that they may be heard by the courts of England. Thus, I find, as a matter of law, that this Court is not the appropriate forum for this dispute. The Clifford Chance Defendants' motion to dismiss on the grounds of *forum non conveniens* is GRANTED.

**CONCLUSION**

For the reasons set for above, Morgan Stanley's motion to dismiss pursuant to Rule 12(b)(6) is GRANTED IN PART and DENIED IN PART. The Clifford Chance Defendants' motion to dismiss on the grounds of *forum non conveniens* is GRANTED. In view of the decision on the forum non conveniens motion, it is not necessary to decide Nexgen's motion to dismiss for lack of personal jurisdiction, and that motion is simply marked off calendar, without prejudice.

The Clerk of the Court is directed to remove the motions at Docket Nos. 89, 91, and 92 from the Court's list of pending motions.

Dated: May 16, 2013

56

_____
                                U.S.D.J.

BY ECF TO ALL COUNSEL