UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VELERON HOLDING, B.V., | **REDACTED - FILED UNDER SEAL** |
| Plaintiff, | |
| - against - | Index No.:  12-cv-5966 (CM) |
| MORGAN STANLEY; MORGAN STANLEY CAPITAL SERVICES, INC.; MORGAN STANLEY & CO., INCORPORATED; MORGAN STANLEY & CO. | ORAL ARGUMENT REQUESTED |
| Defendants. | |

## MORGAN STANLEY'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Jonathan D. Polkes
Paul Dutka
Adam B. Banks

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
jonathan.polkes@weil.com
paul.dutka@weil.com
adam.banks@weil.com

*Counsel for Defendants Morgan Stanley,*
*Morgan Stanley Capital Services, Inc.,*
*Morgan Stanley & Co. Inc., and Morgan*
*Stanley & Co.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS .......................................................................................6

    A.    Deripaska Forms Veleron—a Special Purpose Vehicle—to Make a Strategic Investment in Magna ............................................................................6

    B.    Morgan Stanley Executes a Swap Agreement with BNP ...........................9

    C.    The Global Financial Crisis and Morgan Stanley's Hedges....................12

    D.    The Margin Calls and the Liquidation....................................................13

    E.    The London Arbitration...........................................................................22

I.    VELERON SUFFERED NO INJURY AND THEREFORE HAS NO STANDING TO BRING THIS PRIVATE SECURITIES FRAUD CLAIM............................................23

II.    MORGAN STANLEY DID NOT MISAPPROPRIATE ANY MATERIAL, NON-PUBLIC INFORMATION FROM VELERON .................................................................27

    A.    Veleron Was Not the Source of the Information ......................................28

    B.    Basic Element Refused to Supply Information and Lied ..........................32

III.    MORGAN STANLEY DID NOT OWE VELERON A DUTY OF TRUST AND CONFIDENCE ..........................................................................................................36

    A.    No Confidentiality Agreement Exists.......................................................37

    B.    Morgan Stanley's Internal Compliance Polices Do Not Give Rise to a Duty to, and Are Not Enforceable by, Veleron .............................................41

    C.    Morgan Stanley Cannot Be Liable Because of Its Relationship with BNP.............42

IV.    MORGAN STANLEY'S UNCONTROVERTED EVENT STUDY SHOWS THAT THE INFORMATION WAS NOT MATERIAL AS A MATTER OF LAW ....................46

V.    VELERON CANNOT PROVE LOSS CAUSATION AND DAMAGES...........................48

VI.    VELERON'S MARKET MANIPULATION CLAIM FAILS...........................................49

CONCLUSION.............................................................................................................50

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013)................................................................................................46

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .......................................................................................49

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ....................................................................................49, 50

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
969 F. Supp. 2d 339 (S.D.N.Y. 2013) ........................................................................49

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988).....................................................................................................46

*Berks Cnty. Emps.' Ret. Fund v. First Am. Corp.*,
734 F. Supp. 2d 533 (S.D.N.Y. 2010) (Kaplan, J.)....................................................47

*Brooks v. Outboard Marine Corp.*,
234 F.3d 89 (2d Cir. 2000) .........................................................................................49

*Crawford v. Franklin Credit Mgmt. Corp.*,
758 F.3d 473 (2d Cir. 2014) .......................................................................................23

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014)...................................................................................................43

*Dormitory Auth. of New York v. Continental Cas. Com*,
756 F.3d 166 (2d Cir. 2014) .......................................................................................22

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) .......................................................................................46

*Elkind v. Ligget & Myers, Inc.*,
635 F.2d 156 (2d Cir. 1980) .......................................................................................46

*Greenberg v. Chrust*,
198 F. Supp. 2d 578 (S.D.N.Y. 2002) ........................................................................45

*Gurfein v. Ameritrade, Inc.*,
312 F. App'x 410 (2d Cir. 2009) ................................................................................41

WEIL:\95107832\1\64093.0028

*Hollingsworth v. Perry,*
    133 S. Ct. 2652 (2013).................................................................................23

*In re Citigroup Auction Rate Sec. Litig.,*
    700 F. Supp. 2d 294 (S.D.N.Y. 2009) ......................................................50

*In re Vivendi S.A. Sec. Litig.,*
    634 F. Supp. 2d 352 (S.D.N.Y. 2009) ......................................................47

*J.E. Hoetger & Co. v. Ascenio,*
    572 F. Supp. 814 (E.D. Mich. 1983) ..................................................41, 42

*Mandarin Trading Ltd. v. Wildenstein,*
    16 N.Y.3d 173, 944 N.E.2d 1104 (2011)...................................................42

*Moss v. Morgan Stanley Inc.,*
    719 F.2d 5 (2d Cir. 1983) .........................................................................46

*Ret. Fund v. First Am. Corp.,*
    734 F. Supp. 2d 533 (S.D.N.Y. 2010) (Kaplan, J.)....................................47

*S.E.C. v. Lyon,*
    605 F. Supp. 2d 531 (S.D.N.Y. 2009) ...............................27, 37, 44, 45

*S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.,*
    296 F.R.D. 241 (S.D.N.Y. 2013) .............................................................37

*S.E.C. v. Siebel Sys.,*
    384 F. Supp. 2d 694 (S.D.N.Y. 2005) ......................................................46

*S.E.C. v. Talbot,*
    530 F.3d 1085 (9th Cir. 2008) ............................................................44, 45

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977).................................................................................49

*U.S. Bank Nat'l Ass'n v. Ables & Hall Builders,*
    696 F. Supp. 2d 428 (S.D.N.Y. 2010) ......................................................45

*United States v. Cassese,*
    273 F. Supp. 2d 481 (S.D.N.Y. 2003) ......................................................45

*United States v. Chestman,*
    947 F.2d 551 (2d Cir. 1991) (en banc) ...............................37, 41, 44

*United States v. Falcone,*
    257 F.3d 226 (2d Cir. 2001) ....................................................................37

WEIL:\95107832\1\64093.0028

*United States v. Martoma,*
    993 F. Supp. 2d 452 (S.D.N.Y. 2014) .................................................47

*United States v. O'Hagan,*
    521 U.S. 642 (1997)...........................................................27, 36, 37, 47

*Valente v. Textron, Inc.,*
    559 F. App'x 11 (2d Cir. 2014) ......................................................49

*World Wrestling Entm't Inc. v. Jakks Pac., Inc.,*
    530 F. Supp. 2d 486 (S.D.N.Y. 2007), *aff'd,* 328 Fed. App'x 695 (2d Cir. 2009)............43, 44

**Rules**

S.D.N.Y. Local Civil Rule 56.1 ...............................................................22

**Other Authorities**

U.S. Const. art. III, § 2.........................................................................23

iv

Defendants Morgan Stanley, Morgan Stanley Capital Services, Inc., Morgan Stanley & Co., Inc., and Morgan Stanley & Co. (collectively, "Morgan Stanley"), respectfully submit this Memorandum of Law in Support of Their Motion for Summary Judgment.

## PRELIMINARY STATEMENT

The man responsible for this lawsuit, the Russian oligarch Oleg Deripaska, has already cost defendant Morgan Stanley millions of dollars by refusing to honor his margin loan agreements at issue in this case. He now sues to collect millions more.

Deripaska is the 100% owner of the plaintiff, Veleron Holding, B.V. ("Veleron"), a corporate shell he set up to invest in Magna International, Inc. ("Magna"). Deripaska funded this investment through a margin loan from BNP Paribas, S.A. ("BNP"). Deripaska defaulted on that loan and refused to pay BNP the balance due after the liquidation of the margin. Indeed, at the time he authorized the filing of the original and First Amended Complaint ("FAC") in this matter, Deripaska was refusing to pay the margin loan debt, even though his team of executives admitted in contemporaneous phone calls and emails (and would later admit at their depositions), that BNP was contractually entitled to demand payment. Deripaska's flouting of his contractual obligations to BNP cost defendant Morgan Stanley millions of dollars, because although Morgan Stanley had no contractual or other relationship with either Deripaska or Veleron, Morgan Stanley, along with several other banks, had insured BNP against Deripaska's default on the margin loan, through swap contracts with BNP.

It is against this backdrop that Deripaska sues Morgan Stanley. After the Court's decision on Morgan Stanley's motion to dismiss, all that is left is a claim that Morgan Stanley is liable to Deripaska for hedging its swap contract with BNP. These hedges were designed to, and did, partially mitigate Morgan Stanley's millions of dollars of losses resulting from Deripaska's

default on his debt to BNP.  Through this lawsuit, Deripaska now attempts to use the United States securities laws to force Morgan Stanley to pay millions of dollars more than it already did when Deripaska dishonored his debt—and for good measure, to pay Deripaska himself those millions of additional dollars to reward his misconduct.

Deripaska's theory is that Morgan Stanley hedged its swap with BNP while possessing material, non-public information about the margin calls to Veleron and the potential liquidation of the Magna shares that were the collateral on the loan.  Morgan Stanley hedged its swap by short selling Magna shares.  Deripaska says he was harmed and should be compensated because the short selling allegedly lowered the price of Magna stock, thereby causing a greater deficiency after the liquidation of the collateral.  Therefore, according to Deripaska, BNP presented a bigger bill for the balance due after the liquidation than it otherwise would have.  Never mind that Deripaska reneged on his debt and refused to pay the bill, irrespective of its size.

As discovery has shown and in particular as Deripaska's own executives admitted in their depositions, Veleron and Deripaska and his team *never provided Morgan Stanley or the other banks with any inside information*.  They expressly refused to tell Morgan Stanley and the banks for several days after the first margin call whether they intended to pay the margin call, or even whether they had the funds to pay.  Morgan Stanley and the other banks had no idea what Deripaska intended to do or whether the banks would have to liquidate and take a loss or when. Indeed, the only "inside information" that Morgan Stanley and the other banks received from Deripaska's team was a pack of lies. After Deripaska's team sent the guarantee of one of his other companies, Russian Machines, to secure Veleron's loan, they explicitly told the banks—it is recorded on tape—that the banks no longer needed to worry about any loan shortfall, because any shortfall was now fully guaranteed by a well-funded entity.  But discovery reveals that, all

the while, Deripaska's team had internally taken the position that the guarantee was a sham and that they had no intention to honor it. Which indeed they did not: after the dust settled, after the Magna stock was liquidated, and after he was presented with the bill, Deripaska claimed that the guarantee was void and he reneged.

Thus Deripaska brings the first insider trading case in which the plaintiff actually refused to provide material information to the defendant, and instead blatantly lied to it. Such a case must not stand, and summary judgment should be granted for each of the following reasons.

*First*, the plaintiff Veleron lacks standing to bring this lawsuit—it neither suffered nor could it have suffered any injury. Deripaska is not the Securities and Exchange Commission, with plenary authority to address any violation of the securities laws. Unless Deripaska can show that Veleron was injured directly as a result of Morgan Stanley's hedging, Veleron cannot bring a case, *even if* Morgan Stanley traded while in possession of material inside information (which it did not). Deripaska's only attempt to show injury to Veleron is to allege that the short selling depressed the price of the collateral, leaving a greater deficiency. But it is beyond dispute that the value of Magna stock, and hence the size of the deficiency, had no effect on Veleron: every witness, including Deripaska's, admitted this. Veleron, a "shell company" with no assets other than the Magna shares, was a special purpose vehicle set up by Deripaska for the margin loan, precisely to insulate Deripaska and any part of his empire from liability. Once Veleron defaulted and had its Magna shares sold, it had no legal obligation and no ability to make good on any shortfall between the value obtained by the banks in the liquidation and the balance due on the margin loan. So, as Deripaska's team admitted in their depositions, it was the banks—not Veleron—that assumed all the risks associated with the declining value of Magna stock in the event of a default. This was precisely why Deripaska offered the banks a guarantee from

3

Russian Machines during negotiations.  Only the guaranteeing entity—Russian Machines—had any liability for the shortfall, not Veleron.  Indeed, when Deripaska defaulted on his payment obligation, BNP brought an arbitration against Russian Machines based on the guarantee; not against Veleron.  ███████████████████████████████████████

███████████████████████████.  In short, Veleron has no standing because it was not impacted by the value of the collateral sold in the liquidation.

*Second*, Veleron cannot sue Morgan Stanley for insider trading because, as discovery has shown, Veleron did not provide Morgan Stanley (or BNP for that matter) with any truthful material, non-public information.  BNP issued the margin calls to Veleron, not vice versa.  Veleron did not notify BNP or Morgan Stanley of any margin call.  Further, whether there would be a liquidation was a decision that only BNP could contractually make.  Veleron did not tell the banks about the liquidation, as the FAC alleges; rather, Veleron learned *from* the banks that the collateral had been liquidated—a revelation that "surprised" even Deripaska.  The only alleged material inside information that Veleron could have provided—regarding its liquidity, cash position, ability to pay the margin call, and intention to pay the margin call—it categorically refused to provide, asserting that it was keeping that information confidential.  This is the *opposite* of conveying inside information.  And, as for information regarding restructuring Veleron's loan, Deripaska and his agents tried to defraud the banks, by, among other things, providing a guarantee from Russian Machines, that they later claimed was void.

*Third*, even if Veleron had provided some material information, which it did not, Morgan Stanley and Veleron did not have any relationship of trust and confidence, especially one sufficient to support liability under the misappropriation theory of insider trading.  Veleron survived a motion to dismiss by alleging that Morgan Stanley executed confidentiality

WEIL:\95107832\1\64093.0028

agreements to protect Veleron's confidential information when BNP retained Morgan Stanley as disposal agent. This was false. Discovery has shown that those confidentiality agreements do not exist. In fact, the Swap Agreement between BNP and Morgan Stanley affirmatively obligated BNP to inform Morgan Stanley of any margin calls without imposing any duty of confidentiality. The Disposal Agreement, which memorializes Morgan Stanley's relationship as disposal agent with BNP, also expressly disclaims that it gives rise to fiduciary obligations to BNP, and makes no mention of Veleron. Having struck out on finding any confidentiality agreement, Veleron now contends that Morgan Stanley internal compliance policies establish a duty—running to Veleron, a third-party stranger to the policies—to keep supposed material, non-public information confidential. But a company's internal compliance policies do not give rise to a duty of confidentiality to a private third party. Finally, the "Investor Pack," a document circulated in 2007 that sought lenders to assume part of the margin loan, also does not give rise to a duty of confidentiality. All the information that document conveyed was public long before September and October 2008, when Morgan Stanley traded.

*Fourth*, there is unrebutted record evidence that the alleged inside information was legally immaterial. Morgan Stanley's unrebutted event study shows that when the market learned of the liquidation (and hence the margin calls), there was no statistically significant movement in the price of Magna stock on that day and for several days thereafter. Information is material if there is a substantial likelihood that the disclosure of the information would alter the total mix of information available to a reasonable investor. Yet, here, when the alleged inside information was revealed, the market yawned. Veleron has no evidence to rebut this.

*Fifth*, even if Veleron had standing to pursue this action, Veleron has no competent evidence of loss causation or damages. For one thing, as discussed above, Veleron—as opposed

to Russian Machines—has never paid the deficiency and never will; it has suffered no out-of-pocket losses as a result of Morgan Stanley's challenged trading. Furthermore, the only "evidence" of loss causation or Russian Machines' damages is a purported expert report that should be stricken, as the accompanying *Daubert* motion shows. The report is unreliable because, as the expert admitted at deposition, he relied on four papers he found on the internet that did not purport to, and had never previously been used to, measure the impact of trading on the market price of a security. The report's damages figure is simply the average of four different estimates derived from the four different papers. Significantly, Veleron's expert could not say that any one of the four estimates was more reliable than any other. That is, he could not say that Veleron's damages were "more likely than not" $5 million (the low figure), $12 million (the high figure) or any other amount. Unable to prove its damages to the requisite standard of proof, Veleron's claim must fail.

*Finally*, Veleron cannot sustain its market manipulation claim. To the extent that its claim is premised on Morgan Stanley's allegedly improper short selling, it fails for the reasons discussed above. Short selling, by itself, is not manipulative, and as discussed, Morgan Stanley's short selling was proper.

## STATEMENT OF FACTS

### A. Deripaska Forms Veleron—a Special Purpose Vehicle—to Make a Strategic Investment in Magna

Deripaska is the "sole owner" of Basic Element, a company that employs over 250,000 people and, according to the FAC, accounts for one percent of the Russian gross domestic product.[1] Key members of Deripaska's team at Basic Element were its CEO, Gulzhan

---

[1] FAC ¶¶ 23–24, 32.

WEIL:\95107832\1\64093.0028

Moldazhanova, and its deputy CFO for finance, Andrey Yashchenko.[2] Basic Element owns 100% of Consultrend Enterprises Ltd., which in turn owns 99% of OJSC Russian Machines ("Russian Machines").[3] Russian Machines owns 100% of Plaintiff Veleron,[4] the special purpose vehicle used to finance Deripaska's investment in Magna. Deripaska admitted that he authorized this lawsuit although he never reviewed or even saw the complaints filed in this action before his deposition.[5]

In May 2007, Basic Element announced that Russian Machines would invest in Magna, a Canadian automotive parts manufacturer.[6] Deripaska formed Veleron, a Dutch special purpose vehicle ("SPV"), solely to facilitate the transaction.[7] Deripaska organized Veleron as a Dutch "B.V." or limited liability company.[8] Russian Machines was Veleron's sole shareholder,[9] and because Veleron was a "B.V.," Russian Machines' liability was ████████████████████████

---

[2] Declaration of Jonathan D. Polkes in Support of Morgan Stanley's Motion for Summary Judgment ("Polkes Decl.") Ex. 1 (Deposition of Gulzhan Moldazhanova ("Moldazhanova Tr.")) at 10:23–11:1; Ex. 2 (Deposition of Andrey Yashchenko ("Yashchenko Tr.")) at 13:4–5. Unless otherwise noted, all references to "Ex. ___" are to exhibits to the Polkes Declaration.

[3] Ex. 3 at VEL_0014955.

[4] FAC ¶ 16.

[5] Ex. 4 (Deposition of Oleg Deripaska ("Deripaska Tr.")) at 10:12–23; 91:23–92:2.

[6] FAC ¶ 26.

[7] Ex. 5 (Deposition of Bauke van der Meer ("van der Meer Tr.")) at 33:19–34:3 ████ ██████████
████████████████████████████████████████); Ex. 4 (Deripaska Tr.) at 11:5–9 ████████████████████████████████████████████████
████████████████); FAC ¶ 38 ("Veleron was established as the vehicle for Russian Machines' investment.").

[8] Ex. 5 (van der Meer Tr.) at 15:8–11 ("████████████████████████████").

[9] Ex. 5 (van der Meer Tr.) at 29:18–19 ("████████████████████████████
████████████████"); id. at 91:16–21.

7

███ [10] In other words, Russian Machines had no liability for Veleron's debts.[11] Veleron described itself as a ███ [12] The company never had any employees or officers[13] and its sole director has been a Dutch company called C-Corp, itself a figurehead company that provides statutory director services to over 80 Dutch companies.[14]

Veleron acquired 20 million Magna shares (approximately 20% of the company), financing its purchase with a $1.2 billion margin loan from BNP. Veleron and BNP memorialized the terms of the margin loan in a Credit Agreement executed on September 20, 2007 (the "Credit Agreement").[15] Only Veleron's 20 million Magna shares collateralized the loan.[16] Veleron was required to maintain a "coverage ratio"—a minimum excess of the value of the collateral over the outstanding balance on the loan.[17] If the price of Magna shares fell, pushing the value of the collateral below this pre-determined coverage ratio, BNP could issue a margin call requiring Veleron to post additional cash to restore the coverage ratio.[18] Dishonoring BNP's demand constituted an "Event of Default," and entitled BNP to accelerate the entire

---

[10] Ex. 5 (van der Meer Tr.) at 17:6–8.

[11] Ex. 5 (van der Meer Tr.) at 88:9–21; Ex. 2 (Yashchenko Tr.) at 61:1–6; Ex. 6 at VEL_0005958.

[12] Ex. 7 at VEL_0003255–56; Ex. 2 (Yashchenko Tr.) at 235:11–17; Ex. 4 (Deripaska Tr.) at 11:5–9) ███

[13] Ex. 5 (van der Meer Tr.) at 89:11 ███.

[14] Ex. 5 (van der Meer Tr.) at 10:20–12:22.

[15] Ex. 8 (Credit Agreement) at VEL_0004723.

[16] *Id.*; *see also id.* (Pledge Agreement) at VEL_0004808–52.

[17] Ex. 8 (Credit Agreement § 7.5) at VEL_0004760–61.

[18] Ex. 8 (Credit Agreement §§ 7.5 & 7.6) at VEL_0004760–61.

balance of the loan.[19]  If BNP accelerated the loan and demanded repayment, and if Veleron

defaulted, then BNP had the right to liquidate the collateral.[20]  Magna publicly disclosed the

terms of the Credit Agreement in a Schedule 13D filing on October 1, 2007.[21]

Deripaska intentionally structured the loan as a non-recourse loan between only Veleron

and BNP.  None of his other companies were parties to the Credit Agreement and BNP's

recourse was limited to only the Magna shares held as collateral.[22]  Accordingly, if a liquidation

of the Magna shares resulted in a deficiency—that is, if Veleron defaulted on the loan and the

value of the Magna shares did not cover the outstanding loan balance—BNP would lose money:

BNP could not recover the deficiency from Veleron, Russian Machines, Basic Element, or any of

Deripaska's other companies.[23]

### B.   Morgan Stanley Executes a Swap Agreement with BNP

The non-recourse structure of the margin loan carried significant risks for BNP:  if a

---

[19] Ex. 8 (Credit Agreement § 10.1(1)) at VEL_0004767–68.

[20] Ex. 8 (Credit Agreement §§ 10.2, 1.1(99)) at VEL_0004768, VEL_0004738–39; *id.* (Pledge Agreement § 4.4(2)) VEL_0004819.

[21] Ex. 9 (Magna International Schedule 13D).

[22] Ex. 8 (Credit Agreement); *see also* FAC ¶ 38; Ex. 10 (Veleron's Responses and Objections to Morgan Stanley's First Requests for Admission No. 50); Ex. 1 (Moldazhanova Tr.) at 33:10–16 █████████████████████████████████████████); *id.* at 151:3–22 ████████████████████████████████████████████).

[23] Ex. 2 (Yashchenko Tr.) at 90:22–91:3 ("█████████████████████████████████████████████; *id.* at 98:11–21 ████████████████); FAC ¶ 108 (conceding that before giving the guarantee, Russian Machines "had no liability for Veleron's obligations pursuant to the Credit Agreement"); Ex. 5 (van der Meer Tr.) at 61:16–62:4 ████████████████████████████████).

liquidation occurred and the sale of the collateral left a deficiency, Veleron simply could walk away from the loan, leaving BNP to suffer the losses.  So, beginning in June 2007, BNP solicited several additional international banks to join the loan as additional "Lenders" or "Participants" to have those banks share some of the risk.  To that end, BNP circulated an "Investor Pack" to several other banks, including Morgan Stanley, that described the terms of the margin loan and provided an analysis of Veleron, Russian Machines, and Deripaska.[24]  Consistently with the terms of the margin loan, the Investor Pack warned potential investors that "**The Financing is a non-recourse transaction.**"[25] The Investor Pack explained that Veleron was "created for the purpose of the transaction" and that if, for example, Veleron went bankrupt "**the only assets to which the transaction has recourse are the 20 million Magna Shares together with any cash collateral delivered under the Financing**."[26]  BNP was unsuccessful in signing up any additional banks as Lenders or Participants.[27]

BNP did, however, purchase insurance, in the form of credit default swaps, from several other banks, including Morgan Stanley.  On March 28, 2008, Morgan Stanley and BNP executed a credit default swap (the "Swap") under which Morgan Stanley assumed 8.1% of the exposure to the margin loan.[28]  That is, in exchange for a fixed fee, Morgan Stanley agreed that it would pay BNP 8.1% of any deficiency.  The Swap functioned like insurance.  If Veleron performed its obligations under the loan without incident, then Morgan Stanley would simply retain the fee

---

[24] *See generally* Ex. 11 at MS_VELERON 00000577–615.

[25] Ex. 11 at MS_VELERON 00000596 (emphasis in original).

[26] *Id.* (emphasis in original).

[27] FAC ¶¶ 41, 65.

[28] *See generally* Ex. 12 (Swap Agreement) at BNPP000589–602.

WEIL:\95107832\1\64093.0028

from the Swap—akin to an insurance premium.  But if a default and liquidation occurred, and if the liquidation resulted in a deficiency, Morgan Stanley would have to pay out on the contract—8.1% of the deficiency to BNP.

The Swap Agreement required BNP to provide Morgan Stanley certain information relating to the margin loan.  Among other things, Morgan Stanley was entitled to know whether BNP issued any margin calls to Veleron and whether Veleron made any pre-payments on the loan.[29]  The Swap Agreement also required BNP to inform Morgan Stanley if BNP decided not to execute certain rights under the Credit Agreement (such as waiving the right to declare a default or accelerate the loan) because doing so would alter the risk profile on the Swap.[30] Significantly, the Swap Agreement specifically disclaimed that it gave rise to any confidentiality obligation concerning this information: "a party receiving information from the other party with respect to such Credit Derivative Transaction shall *not* become subject to any obligation of confidentiality in respect of that information."[31]

Separately, on January 31, 2008, Morgan Stanley and BNP entered into an Agency Disposal Agreement (the "Disposal Agreement") whereby Morgan Stanley agreed to sell the collateral on behalf of BNP if Veleron defaulted on the margin loan and BNP decided to sell the Magna shares.[32]  The Disposal Agreement specifically stated that it did not create a fiduciary

---

[29] Ex. 12 (Swap Agreement § 7(g)) at BNPP000600 ("[BNP] agrees to notify [Morgan Stanley] of (1) *Margin Calls*: any demand by [BNP] that Cash Margin be delivered by [Veleron] . . . within 1 Business Day of the date of such demand; and (2) *Prepayments:* any Reference Obligation Reduction Amount, within 1 Business Day.").

[30] Ex. 12 (Swap Agreement § 7(d)) at BNPP000598–99.

[31] Ex. 13 (2003 ISDA Credit Derivative Definitions § 9.1(b)(v)) (emphasis added); *see also* Ex. 12 (Swap Agreement) at BNPP000589 (incorporating the 2003 ISDA definitions).

[32] Ex. 14 (Disposal Agreement) at BNPP000527–36.

11

relationship between Morgan Stanley and BNP: "[BNP] does not intend Morgan Stanley to act in any capacity other than independent contractor including as a fiduciary or in any other position of higher trust."[33]

### C.   The Global Financial Crisis and Morgan Stanley's Hedges

Morgan Stanley monitored its exposure under the Swap to determine whether it needed to hedge to offset any potential payouts to BNP.[34]   Because the fee built into the deal on day one was the only income Morgan Stanley hoped to achieve on the Swap, Morgan Stanley hedged to counteract any risks emerging as market conditions changed.[35]   As Magna's share price declined and approached the margin call trigger price, the risk increased that Morgan Stanley would have to make a payout to BNP.[36]

In late September 2008, as Magna's sagging share price approached the margin call trigger, Morgan Stanley's risk management models alerted Kerim Tuna, the Morgan Stanley trader responsible for the Swap.[37]   To manage the risk associated with Swap, Mr. Tuna consulted

---

[33] Ex. 14 (Disposal Agreement) at BNPP000528–29.

[34] Ex. 15 (Deposition of Kerim Tuna ("Tuna Tr.")) at 78:14–79:6 ██████████████████ ████████████████████████████████████ ).

[35] Ex. 16 (Deposition of Sylvain Mirochnikoff ("Mirochnikoff Tr.")) at 120:2–11 ████████ ████████████ ).

[36] Ex. 16 (Mirochnikoff Tr.) at 208:19–209:11; Ex. 17  (Deposition of Michael Edleson ("Edleson Tr.")) 28:1–11 ██████████████████████████████████████████ ██████████████████████████████████████████ ██████ ). "Delta" is ████████████████████████  Ex. 18 (Deposition of John Neary ("Neary Tr.")) at 111:5–10.

[37] Ex. 15 (Tuna Tr.) at 87:2–88:8; Ex. 18 (Neary Tr.) at 112:5–10 ██████████████ ██████████████████ ).

WEIL:\951078321\1\64093.0028

with his supervisors and internal legal counsel about putting on a hedge, and his superior authorized executing short sales to hedge the risk of a loss under the Swap, as is standard practice in the securities industry.[38]   Short positions would counteract that potential loss because Morgan Stanley would gain with a decrease in Magna's price.

Between September 30, 2008 and October 1, 2008, as a hedge on the Swap, Morgan Stanley sold short 352,160 Magna shares.[39]   Morgan Stanley established these positions using a Volume Weighted Average Pricing or "VWAP" strategy, a trading strategy designed to minimize any impact on the price of the securities.[40]   This strategy reflected standard industry practice.[41]

### D.   The Margin Calls and the Liquidation

Magna's declining share price also triggered a series of notices from BNP to Veleron, showing that BNP was telling Veleron (and Deripaska) the status of the loan, not the reverse.

BNP Sends Veleron the First Margin Call

On Monday, September 29, 2008, Magna's share price fell below the margin call trigger,

---

[38] Ex. 18 (Neary Tr.) at 113:21–114:3 █████████████████████████
████████████████████████████████████████████
████████████████████████████████ ); Ex. 15 (Tuna Tr.) 138:7–23;
Ex. 19 (Expert Report of Charles Jones) ¶¶ 18–36; Ex. 20 (Deposition of Charles Jones) at 43:2–8; *id.* at 84:12–24.

[39] Ex. 21 at Nos. 125 & 145.

[40] Ex. 18 (Neary Tr.) at 118:14–19 ███████████████████████████
█████████████████████████████████████████████ );
Ex. 15 (Tuna Tr.) at 127:12–14 ████████████
████████████████████ ).

[41] Ex. 18 (Neary Tr. 118:6–9) █████████████████████████████
█████████████████████████████████████

13

and at 4:38 p.m. (E.D.T.), BNP issued a margin call to Veleron, demanding that Veleron pay $92 million by 1:00 p.m. on Wednesday, October 1, 2008 to restore the coverage ratio.[42]  The margin call reflected an arithmetic computation involving the coverage ratio built into the Credit Agreement, the outstanding loan balance, and Magna's share price.  All parties monitoring the loan—including key members of Deripaska's team at Basic Element, Moldazhanova and Yashchenko—had been following Magna's share price to gauge whether a margin call would issue; given Magna's falling share price, the margin call did not surprise anyone.[43]  Ensuing discussions between Basic Element and BNP specifically focused on whether one of Veleron's upstream entities would propose a restructuring or pay the margin call.  Shortly after the margin call issued, at 1:52 a.m. on Tuesday, September 30, Basic Element deputy CFO Andrey Yashchenko told BNP that ███████████████████████████.[44]  Basic Element thereafter sought to ████████████████████.[45]

### BNP Sends Veleron an Accelerated Margin Call

Magna's share price continued to tumble on September 30.  When the markets closed, Magna's share price had fallen far enough to trigger an "accelerated" margin call under the

---

[42] Ex. 22 at VEL_0003415–16.

[43] Ex. 23 at VEL_0018391; Ex. 1 (Moldazhanova Tr.) at 41:15–16 ████████████████ ███████████████████████████); Ex. 24 at VEL_0057751; Ex. 2 (Yashchenko Tr.) at 15:3–14 (" ████████████████████████████ ███████████████████████████ ███████); id. at 16:3–6 ██████).

[44] Ex. 25 at VEL_0013259.

[45] Ex. 2 (Yashchenko Tr.) at 31:24–32:1; Ex. 1 (Moldazhanova Tr.) at 60:18–19 ████████ ██████████████████████████████.

WEIL:\95107832\1\54093.0028

Credit Agreement.[46]  At 4:44 p.m. (E.D.T.) on September 30, BNP issued the accelerated margin

call, requiring Veleron to pay an additional $21 million—for a total of $119 million—by 1:00

p.m. on October 1, 2008.[47]

> ### BNP Sends Veleron a Reservation of Rights, and Basic Element Refuses to Share Information with BNP

Veleron failed to meet the margin call, and BNP sent Veleron a reservation of rights.[48]

Discovery confirms that Basic Element had the ability to pay these margin calls.[49]  Basic

Element's CEO Gulzhan Moldazhanova testified that ███████████████████████

████████████████████████.[50]  Deripaska likewise testified at his deposition that

████████████████████████████████████████████

███[51]  Indeed, Deripaska directed Yashchenko ███████████████████

█████████████████████████.[52]

But Basic Element did not share any of this information with the banks.  Throughout the

next two days, including *after* Morgan Stanley's short sales, Basic Element officials refused to

---

[46] Under the Credit Agreement, a substantial decline in Magna's share price would trigger an
"accelerated" margin call, which requires Veleron to pay cash to restore the coverage ratio in one
business day rather than two. Ex. 8 (Credit Agreement § 7.6) at VEL_0004761.

[47] Ex. 26 at VEL_0008364–65.

[48] Ex. 27 at VEL_0008388–91. ████████████████████████████████████
█████████████████████████████████████████████████      *Id.* at
VEL_0008390–91.

[49] Ex. 1 (Moldazhanova Tr.) at 60:18–24 ███████████████████████████
██████████████████████████████

[50] Ex. 1 (Moldazhanova Tr.) at 184:11–20.

[51] Ex. 4 (Deripaska Tr.) at 57:12–17.

[52] Ex. 28 at VEL_0048647; Ex. 29 at VEL_0016036; Ex. 4 (Deripaska Tr.) at 75:11–76:22.

WEIL\95107832\1\64093.0028

disclose the company's cash position and its intentions to pay (or not pay) the margin calls.  On an October 2 teleconference with the banks (after Morgan Stanley traded), Basic Element CEO Moldazhanova refused to answer a direct question about Basic Element's cash position: ███████ ████████████████████████████[53]  She refused, as she later admitted in her deposition, ████████████████████████████████████████████████[54] On another October 2 call, also in response to a direct question about Basic Element's cash position, Moldazhanova told the banks that Basic Element was "not kind of – well, disclosing the amount of cash we are having."[55]  This refusal, too, reflected Basic Element's unwillingness to share information with the banks—████████████████████████████████ ███████████████████[56]

Although Basic Element remained tight-lipped about its cash position, it began negotiating with BNP and the other banks about waiving the margin calls and restructuring the margin loan.[57]  The two main negotiators for Basic Element were its CEO Moldazhanova and its deputy CFO Yashchenko.  Basic Element told the banks that it was seeking financing from the Russian state-owned bank, the Vnescheconombank ("VEB"), under a recovery program for Russian financial institutions.[58]  Basic Element also said it was in discussions for financing from

---

[53] Ex. 30 at BNPP004073.

[54] Ex. 1 (Moldazhanova Tr.) at 159:1–20.

[55] Ex. 31 at BNPP004150.

[56] Ex. 1 (Moldazhanova Tr.) at 162:14–16.

[57] Ex. 2 (Yashchenko Tr.) at 32:1–2 (Basic Element started ███████████████████ █████████).

[58] Ex. 30 at BNPP004045 (Andrey Yashchenko: ████████ ████████████████████████████████████████ █████████████████████████████████████████

Magna.[59]

But for the banks, a critical element of the restructuring talks was whether any of Deripaska's companies would back the loan.  Because the loan was non-recourse—only Veleron, the shell company, was a party to the Credit Agreement—the banks insisted that any waiver of the margin calls or restructuring include a guarantee from one of Deripaska's companies with assets to back the loan.[60]  The Basic Element officials also recognized that a guarantee was important because, without it, the banks' only recourse was to the Magna shares, and that the *banks*, not Veleron or any other Basic Element entity, would suffer any shortfall after a liquidation.[61]

Therefore, on Wednesday, October 1, 2008, Basic Element agreed to extend a guarantee from Russian Machines in exchange for a 24-hour waiver of the banks' rights under the margin loan.[62]  On a teleconference, Yashchenko told the banks that ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[59] Ex. 30 at BNPP004046 (Andrey Yashchenko: ████████████████████████ ██████████████████████████████ ).

[60] Ex. 2 (Yashchenko Tr.) at 246:2–6 ███ █████████████████████████████ ████████████████████ ).

[61] Ex. 1 (Moldazhanova Tr.) at 150:15–20 (" ██ ████████████████████████ █████████████████████ ); Ex. 2 (Yashchenko Tr.) at 77:20–78:6 ███████████████████████ ████████ .

[62] Ex. 28 at VEL_0048647; Ex. 32 at VEL_0020308–18; Ex. 33 at VEL_0074916.

WEIL:\95107832\1\84093.0028

████████████████████████████████████████[63] BNP sent Yashchenko a draft guarantee later that day.[64]  Yashchenko then wrote to Moldazhanova that ████████████ ███████████████████████████████████████████████████ ████████████████████[65]  After Basic Element and BNP exchanged comments on the guarantee,[66] Basic Element confirmed that ███████████████████████████████ ██████████████████████████[67] At 5:23 p.m. (E.D.T.), Basic Element sent BNP a signed copy of the guarantee.[68]

But privately Basic Element considered Russian Machines' guarantee to be unauthorized and invalid.  Moldazhanova, Basic Element's CEO, testified at her deposition that ████████ ████████████████████████████████████████████████ ████████████████████.[69]  Moldazhanova testified that ███████████ █████████████████████████████████████████████ ██████████████████████████████████████████[70]

Nonetheless, Moldazhanova lied to the banks about her belief that the guarantee was invalid.  On one conference call with the banks, rather than disclosing that the guarantee Basic Element had delivered was unauthorized, Moldazhanova concealed her belief because ██████████████



---

[63] Ex. 34 at BNPP001726.

[64] Ex. 32 at VEL_0020308.

[65] Ex. 28 at VEL_0048647; Ex. 2 (Yashchenko Tr.) at 122:16–25.

[66] Ex. 35 at VEL_0020323–33 (Basic Element); Ex. 36 at VEL_0020337–49 (BNP).

[67] Ex. 37 at VEL_0020362.

[68] Ex. 38 at VEL_0020381–94.

[69] Ex. 1 (Moldazhanova Tr.) at 100:1–2; *see also id.* at 96:15–100:24.

[70] Ex. 1 (Moldazhanova Tr.) at 97:24–98:2; 99:8–10.

WEIL\95107832\1\64093.0028

████████████████████████████████ [71]  Furthermore, on a separate conference

call, a bank official reminded Moldazhanova that because of the guarantee, Russian Machines

would be liable for any deficiency after a liquidation: "well, remember though you've issued us a

guarantee, so if we lose losses on selling the security, if we decide to take that route, the shortfall

is still due by your company under the guarantee you've issued."[72]  Moldazhanova did not

correct the official.  Instead, she responded, "Well, okay," and ███████████████

███████████"[73]  Indeed, Moldazhanova went so far as to point to the guarantee as evidence

that the banks did not need more security during the restructuring talks: ████████████

████████████████████████████████ [74]  (Basic

Element's undisclosed position that the guarantee was invalid because there was no signed board

resolution was yet another lie: ███████████████████████.[75])

Basic Element's deception was not limited to the guarantee.  Despite Basic Element's

assurances to the banks that ████████████████████████████████[76]

████████████████████████████████████████

████████████████████████████████████

████████ [77]  In addition, the timing of any receipt of funds from the VEB was highly uncertain. [78]

---

[71] Ex. 1 (Moldazhanova Tr.) at 141:3–24.

[72] Ex. 31 at BNPP004153–54.

[73] *Id.*; Ex. 1 (Moldazhanova Tr.) at 168:7–8.

[74] Ex. 30 at BNPP004062–63.

[75] Ex. 39 at VEL_0014381–84; Ex. 40 at VEL_0014385–89.

[76] Ex. 30 at BNPP004052.

[77] Ex. 41 at VEL_0003835; Ex. 1 (Moldazhanova Tr.) at 114:17–115:19; *id.* at 120:16-25.

Similarly, the prospects of Magna financing arriving in time to satisfy the banks were low.[79]

<u>BNP Declares a Default</u>

The nail in the coffin for the restructuring talks came when the banks learned that Basic Element had lied to them about the guarantee.  On a teleconference at 1:54 p.m. (E.D.T.) on Thursday, October 2, 2008, BNP reported to the rest of the banks that █████████████████ ████████████████.[80]  The banks concluded that Basic Element was████████████████ ██████████████████████████████████████████████████."[81]  At 5:01 p.m. (E.D.T.) on October 2, BNP sent Veleron a Notice of Default (i) declaring the credit facility expired and the entire principal amount owing and (ii) informing Veleron that "if payment or arrangements satisfactory to the Agent for payment are not made by 8:00 pm (Toronto time), [BNP] will take such steps as it deems necessary to recover [Veleron's] indebtedness" including "enforcement of the security under the pledge and security agreement."[82]  With no payment forthcoming, BNP instructed Morgan Stanley to liquidate.[83]

---



[78] Ex. 1 (Moldazhanova Tr.) at 71:1–6 ("█ ████████████████████████████ ███████████████████████████████████████████████ ); id. at 118:19-119:2█████████ ██████████████████████████████████████

[79] Ex. 1 (Moldazhanova Tr.) at 106:2–13 ("██████ ████████████████ ██████████████████████████████████████████████████ ██████████████████████ ).

[80] Ex. 42 at BNPP004228.

[81] Ex. 42 at BNPP004229; id. at BNPP004236.

[82] Ex. 43 at VEL_0044838–45.

[83] Ex. 44 at MS_VELERON 00001452–54.

WEIL:\95107832\1\64093.0028

Morgan Stanley determined that the best disposal strategy for selling the Magna shares was an accelerated book build, or ABB, given the high volatility in the marketplace at that time.[84]   An ABB is a sale typically used to rapidly dispose of a large block of stock not through a stock exchange.[85]   Because of uncertainty in the U.S. markets, Morgan Stanley advised that any liquidation of the Magna shares be postponed until the following morning, Friday October 3.   At approximately 7:00 a.m. (E.D.T.) on October 3, 2008, Morgan Stanley commenced the ABB.[86]   The ABB finished by around 9:30 a.m., when the markets opened.[87]   In all, 18,671,512 Magna shares were sold in the ABB, at an average price of $37.60.[88]   The remaining shares were sold on the public market at an average price of $41.65.[89]   The liquidation brought in $748 million (net of brokerage fees of 1.25%).[90]   Because the outstanding balance on the margin loan was $827 million, the liquidation left a shortfall of $79 million.[91]

Morgan Stanley Loses Money on the Swap

Because of the shortfall, Morgan Stanley owed BNP approximately $6.6 million under the Swap Agreement.[92]   Although covering its short positions in the ABB mitigated Morgan

---

[84] Ex. 45 (Deposition of Mohit Assomull ("Assomull Tr.")) at 151:24–152:5.

[85] Ex. 45 (Assomull Tr.) at 72:21–25.

[86] Ex. 45 (Assomull Tr.) at 109:12–16.

[87] Ex. 45 (Assomull Tr.) at 259:9–11.

[88] Ex. 46 at MS_VELERON 00004678.

[89] Ex. 46 at MS_VELERON 00004678.

[90] Ex. 47 at VEL_0003652.

[91] *Id.*

[92] Ex. 48 (Declaration of Simon Connolly) ¶ 4.

Stanley's loss by approximately $4.6 million, it was still left with an overall loss of $2 million.[93]

Separately, Morgan Stanley earned approximately $9 million as a disposal fee.[94]

### E.  The London Arbitration

Because Russian Machines had guaranteed the loan, in the weeks and months after the liquidation, BNP attempted to collect the deficiency from Russian Machines.  Basic Element offered a contemporaneous explanation: 

."[95]  BNP's collection efforts failed.  So, on August 6, 2010, BNP initiated arbitration proceedings in London to recover under the guarantee.[96]  After several years of litigation, on August 30, 2013, the arbitrator issued his Award,

.[97]  Deripaska decided to place Russian Machines into Russian insolvency proceedings.[98]

## ARGUMENT

"Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  *Dormitory Auth. of New York v.*

---

[93] *Id.* ¶ 5.

[94] The disposal fee was 1.25% of the $757 million proceeds from the liquidation. Ex. 46; Ex. 14.

[95] Ex. 7 at VEL_0003255; Ex. 2 (Yashchenko Tr.) at 236:22–237:2.  Yashchenko also observed that the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." Ex. 49 at VEL_0054515.

[96] Plaintiff Veleron's Response to the Morgan Stanley Defendants' Statement Pursuant to S.D.N.Y. Local Civil Rule 56.1 and Veleron's Counterstatement of Additional Material Facts ("Veleron Collateral Estoppel 56.1 Statement"), Dkt. No. 195, ¶ 10.

[97] Veleron Collateral Estoppel 56.1 Statement ¶ 26 (sealed version).

[98] Ex. 50 (Order from the Moscow Arbitrazh Court).

WEIL\95107832\1\84093.0028

*Continental Cas. Com*, 756 F.3d 166, 169 (2d Cir. 2014) (internal quotations and alterations omitted).  "[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by 'point[ing] to an absence of evidence to support an essential element of the nonmoving party's' case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir. 1988)). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## I.   VELERON SUFFERED NO INJURY AND THEREFORE HAS NO STANDING TO BRING THIS PRIVATE SECURITIES FRAUD CLAIM

Veleron suffered no injury from Morgan Stanley's short sales of Magna stock.  The judicial power of the federal courts is limited to deciding actual "Cases" or "Controversies," U.S. Const. art. III, § 2, and an essential aspect of this requirement is that a plaintiff must prove that it "has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  This means, "for a federal court to have authority under the Constitution to settle a dispute, the party before it must seek a remedy for a *personal* and *tangible* harm." *Id.* (emphasis added).  And, although a plaintiff must satisfy this injury-in-fact requirement when filing its lawsuit, "Article III demands that an 'actual controversy' persist throughout *all* stages of litigation." *Id.* (emphasis added) (citing *Already, LLC v. Nike, Inc.*, __ U.S. __, 133 S. Ct. 721, 726 (2013)).  Because Veleron cannot prove that it suffered (and continues to suffer) a *personal* injury-in-fact "fairly traceable" to Morgan Stanley's challenged trading, Veleron does not have Article III standing to bring this private securities fraud claim.

The only injury Veleron purports to allege (much less prove, *see infra* pp. 48–49) even remotely "traceable" to Morgan Stanley's challenged trading is that Morgan Stanley's short sales of Magna stock on September 30 and October 1, 2008 depressed the price of Magna stock on October 3, the day of the ABB, and therefore reduced the proceeds realized in the ABB. Thus, according to Veleron, the deficiency left after the sale of the collateral was larger than it otherwise would have been absent Morgan Stanley's short sales.[99]

But Veleron has never had any obligation to pay that deficiency; so, the amount of the proceeds from the liquidation and, hence, the size of any deficiency, has never had any effect on Veleron. When Veleron defaulted on the margin loan, it lost all rights in the Magna shares,[100] and it washed its hands of the loan. The shares were the banks' only recourse for the loan,[101] and because Veleron was █████████████████████████████████████,[102] Veleron had no further obligation to the banks—the banks could not look to Veleron for any further recovery and instead were left on the hook for any deficiency, no matter its size.

Critically, there is no dispute that the *banks*—not Veleron—would bear all losses if there

---

[99] FAC ¶ 258 ("This unlawful trading, which was based on material non-public information, contributed to the depressed price of Magna's stock during the crucial period when the ABB was being priced and carried out. Thus, during the ABB, the Pledged Collateral was sold for substantially less than it would have been absent the unlawful trading."); *see also* MTD Order at 33 ("Veleron alleges that shorting the stock depressed the price at which the ABB took place, leaving it a greater deficiency.").

[100] Ex. 8 (Credit Agreement) at VEL_0004819.

[101] Ex. 1 (Moldazhanova Tr.) at 33:10–16 ); *id.* at 151:3–22 ("█████████████████████████████████████"); Ex. 5 (van der Meer Tr.) at 61:16–62:4; Ex. 2 (Yashchenko Tr.) at 98:11–21.

[102] Ex. 2 (Yashchenko Tr.) at 235:1–236:20; *id.* at 228:24–229:5; Ex. 7 at VEL_0003256; Ex. 5 (van der Meer Tr.) at 60:22–61:10.

WEIL\95107832\1\64093.0028

were a deficiency, and that Veleron would have no obligation to the banks for any deficiency. Basic Element contemporaneously admitted on tape-recorded phone calls that a deficiency would harm only the banks because they could not recover any deficiency from Veleron: according to Basic Element CEO Moldazhanova, ███████████████████████████████ ████████████████████████[103] Basic Element's deputy CFO Andrey Yashchenko likewise announced that ██ ██████████████████████████████████████ ██████████████████████████,"[104] And the Investor Pack that BNP used to solicit banks to join the loan syndicate described the loan, in bold type, as non-recourse: "The **Financing is a non-recourse transaction . . . Should Veleron and Newco II go bankrupt, the** *only* **assets to which the transaction has recourse are the 20 million Magna Shares together with any cash collateral delivered under the Financing."**[105]

Basic Element officials also conceded at their depositions that in a liquidation, ████████████ ████████████████████████[106] Because it was a non-recourse loan, the Basic Element officials agreed, the banks were ████████████████████████████████████████ ██████████████████████████.[107] And Yashchenko testified that a

---

[103] Ex. 31 at BNPP004154; Ex. 1 (Moldazhanova Tr.) at 150:15–20.

[104] Ex. 51 at BNPP001532; Ex.2 (Yashchenko Tr.) at 58:24–61:25; *id.* at 97:24–99:1; Ex. 34 at BNPP001733–34 (Russian Machines advocates that ████████████████████████████ ████████████████).

[105] Ex. 11 at MS_VELERON 00000596 (emphasis in original).

[106] Ex. 1 (Moldazhanova Tr.) at 165:4–6; *id.* at 164:5 (████████████████████████ █████████████); Ex. 2 (Yashchenko Tr.) at 228:24–229:5 (████████████████████████ ████████████████████████████████████).

[107] Ex. 2 (Yashchenko Tr.) at 98:18–21; *id.* at 90:25–91:3 ████████ █ ████████████ ████████).

WEIL:\95107632\1\84093.0028



[108] Indeed, as Yashchenko agreed, ███████ [109] Thus, Basic Element conceded, ███████ .”[110] At bottom, Basic Element admitted, ███████ [111]

Indeed, it was precisely because Veleron had no obligation on the margin loan beyond the Magna shares that obtaining a guarantee in restructuring talks was so important for the banks. As even the FAC alleges, "[T]he Guarantee transformed the Loan from an obligation with limited recourse (*i.e.*, recourse only to Veleron) into an obligation that was fully recourse to a solvent, well-established and profitable entity."[112] But the guarantee meant only that *Russian Machines* would be liable if a liquidation left a deficiency on the margin loan. The guarantee did

---

[108] Ex. 2 (Yashchenko Tr.) at 60:11–61:6.

[109] Ex. 2 (Yashchenko Tr.) at 236:16–20 ("██████
██████).

[110] Ex. 1 (Moldazhanova Tr.) at 150:15–20 ██████
██████); Ex. 2 (Yashchenko Tr.) at 77:20–
78:6 ("██████); *id.* at 98:11–21 ("██████
██████).

[111] Ex. 5 (van der Meer Tr.) at 60:6–10.

[112] FAC ¶ 109; *see also* Ex. 2 (Yashchenko Tr.) at 246:2–6 ("██████
██████); Ex. 5 (van der Meer Tr.) at 61:16–62:4;
FAC ¶ 108 (conceding that before the guarantee, Russian Machines ██████
██████).

not infuse assets into Veleron or obligate Veleron to pay the deficiency.  Veleron remained a

shell company with no assets other than the Magna shares; and its shareholders' liability was

limited only to the amount they invested in the company and with no liability for its debts.[113]

Veleron, put simply, had no obligation to pay any of the deficiency and had nothing that the

banks could collect.  Unsurprisingly, then, there is no evidence Veleron ever paid the deficiency,

or suffered any harm because of its allegedly enlarged size.

In the end, Veleron—not Russian Machines—is the plaintiff in this action, but only

Russian Machines—not Veleron—even allegedly suffered an injury or damages from Morgan

Stanley's short sales.   Veleron's lack of injury or damages disposes of this case—Veleron has

no standing to sue for Russian Machines' alleged injuries.[114]

## II.    MORGAN STANLEY DID NOT MISAPPROPRIATE ANY MATERIAL, NON-PUBLIC INFORMATION FROM VELERON

Under the misappropriation theory of insider trading, "a person commits fraud in

connection with a securities transaction when he misappropriates confidential information for

securities trading purposes, in breach of a duty owed to the *source of the information*."  Decision

& Order on Defendants' Motions to Dismiss ("MTD Order"), Dkt. No. 162, at 25–26 (emphasis

in original) (quoting *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) and *S.E.C. v. Lyon*,

---

[113] Veleron is a special purpose vehicle organized as a Dutch "BV," similar to a limited liability company in the United States, its shareholders' liability is limited only to the amount they have invested in the company; its shareholders are not liable for any of its debts.  Ex. 5 (van der Meer Tr.) at 17:5–11, 88:9–17; Ex. 2 (Yashchenko Tr.) at 61:1–6; Ex. 6 at VEL_0005958.

[114] Deripaska could not successfully amend the FAC to make Russian Machines a plaintiff here. For one thing, at Veleron's insistence, the Court extended the deadline to amend pleadings to October 3, 2013, *see* Dkt. No. 124, a date that has long since passed.  In any event, Russian Machines refused to pay the deficiency when BNP demanded that it do so; it hardly can claim injury for being presented with a bill it refused to pay.  And, Russian Machines argued before the arbitrator that the guarantee was invalid and it had no liability for the deficiency.  Russian Machines cannot claim the exact opposite here.

WEIL:\95107832\1\64093.0028

605 F. Supp. 2d 531, 541 (S.D.N.Y. 2009)).  But the Court need not even reach the question

whether Morgan Stanley owed Veleron any duty of trust and confidence because discovery has

shown that Veleron did not convey any material, non-public information to Morgan Stanley.

The FAC alleges that Morgan Stanley traded while knowing about the margin calls, Veleron's

efforts to restructure the loan, and the impending liquidation.[115]  Not only was Veleron not the

source of this information but discovery has also conclusively shown—including as Basic

Element officials admitted in depositions—that Basic Element refused to give information to

Morgan Stanley and told Morgan Stanley and the other banks outright lies.  Veleron's actions

were the *opposite* of entrusting Morgan Stanley with confidential information—Veleron instead

kept Morgan Stanley in the dark and supplied only misrepresentations.  No insider trading case

can be premised on these circumstances.

### A.    Veleron Was Not the Source of the Information

Veleron first contends that Morgan Stanley improperly traded while knowing that BNP

had issued margin calls to Veleron and that the Magna shares would be liquidated.  But

discovery shows that Veleron was not the source of any of this information.  From the first

margin call on September 29, 2008 through the liquidation of the collateral on the morning of

October 3, 2008, all information about the status of the margin loan flowed in one direction:

from BNP to Deripaska's management team at Basic Element.  BNP issued the first margin call

notice to Veleron; BNP issued the accelerated margin call notice to Veleron; BNP sent Veleron a

reservation of rights; BNP declared a default; and BNP sent Deripaska notice of the shortfall.

There was never any doubt that BNP was telling Deripaska the status of the loan and potential

liquidation, not the other way around.

---

[115] *See* FAC ¶ 254.

To begin with, BNP issued the margin call notices, not Veleron, so Morgan Stanley could not have learned about the margin calls from Veleron.[116] Furthermore, whether a margin call would issue was an arithmetic calculation based on Magna's stock price, the outstanding loan balance, and the trigger point set forth in the Credit Agreement.[117] The formula was programmed into Morgan Stanley's risk management systems after it booked the Swap with BNP and the fact that a margin call would issue could be determined by tracking the price of Magna stock, as Morgan Stanley did.[118] No information of Veleron's (or, for that matter, of BNP's)—inside, confidential or otherwise—had any bearing on Magna's share price, and thus whether a margin call would issue. In other words, Morgan Stanley learned about the margin call at the same time and in the same way as BNP—based on the decline in Magna's share price. Even Basic Element's officers admitted that ███████████████████████████████████

█████████████████████████████████████████████████

███.[119] At bottom, the evidence shows that the parties were monitoring Magna's falling share price—not communications from Veleron—to determine whether a margin call would issue.

---

[116] Ex. 22 at VEL_0003415–16; Ex. 26 at VEL_0008364–65.

[117] Ex. 8 (Credit Agreement) at VEL_0004760–61; Ex. 1 (Moldazhanova Tr.) at 21:2–22:12; Ex. 15 (Tuna Tr.) at 50:18–51:8; id. at 78:14–18; Ex. 16 (Mirochnikoff Tr.) at 177:23–178:17. The terms of the Credit Agreement were disclosed in Magna's public filings on October 1, 2007, a year before Morgan Stanley's challenged trading. See supra p. 9 & n.21. Although the margin call trigger also depended on the outstanding balance of the loan, as discussed infra pp. 39–40, Morgan Stanley was entitled to this information under the Swap Agreement, without any confidentiality obligations.

[118] Ex. 15 (Tuna Tr.) at 126:16–25; id. at 202:13–16 ████████████████████████
████ Ex. 52 at MS_VELERON 00000888 (the computer systems are "set up such that on the day there is a margin call (yesterday) it gives a warning so we can stay on top of it.").

[119] Ex. 1 (Moldazhanova Tr.) at 38:18–21; 41:15–16; Ex. 53 at VEL_0054763–66; Ex. 23 at VEL_0018391; Ex. 2 (Yashchenko Tr.) at 16:3–6.

Moreover, the undisputed discovery record shows that Veleron did not—nor could it—convey information about the liquidation, or its likelihood, to Morgan Stanley. By contrast, discovery shows that it was *Veleron* that learned about the liquidation from Morgan Stanley and the other banks. As an initial matter, the Credit Agreement dictates that the decision whether to liquidate was BNP's—not Veleron's.[120]  BNP, in making that determination, relied on the collective input of the banks, including Morgan Stanley.[121]  But Veleron had no control over that decision and necessarily could not have conveyed that determination to Morgan Stanley.

Further, Basic Element conceded at the time that the decision whether to liquidate rested entirely with BNP and the banks. For example, Basic Element's CEO told the banks on a conference call that "all the rights are on your side," and that "all the decision making tools are in your hands," recognizing that the banks, not Veleron, Russian Machines, or Basic Element, had the contractual right to determine when or whether to liquidate the stock.[122]  Indeed, the Basic Element officials admitted, even if there were a default on the margin loan, BNP still had the right to decide not to liquidate the shares.[123]  And whether any of Basic Element's restructuring proposals would be acceptable to Morgan Stanley and the other banks, and thus stave off liquidation, was not something Morgan Stanley possibly could have learned from Veleron. For example, Morgan Stanley's Woodruff explained that ██████████████████████

---

[120] Ex. 8 (Credit Agreement); Ex. 54 (Deposition of Kevin Woodruff ("Woodruff Tr.")) at 182:7–15 ("████████████████████████████████.").

[121] Ex. 54 (Woodruff Tr.) at 184:4–185:12.

[122] Ex. 31 at BNPP004158–59; Ex. 1 (Moldazhanova Tr.) at 169:21–171:9.

[123] Ex. 2 (Yashchenko Tr.) at 213:25–214:4 ██████████████████████
██████████████████████████████ "); *id.* at
215:24–216:7 ("████████████████████████
██████████████████████

WEIL:\95107832\1\64093.0028

███████████████████████████████████████████████████████████

████████████████████████[124]  Obviously, Morgan Stanley did not learn this from

Veleron, or even BNP.  In short, the evidence shows that the liquidation was the banks'

collective decision, not Veleron's.  And, as tape-recorded conversations show, BNP decided to

liquidate, with the agreement of the banks, only after the banks learned that Russian Machines

had lied to them about the guarantee—"████████████████████████████,"[125]

It is unsurprising therefore that discovery has shown that Basic Element had *no idea*

whether a liquidation would occur.  Critically, even *after* Morgan Stanley sold short on

September 30 and October 1, Basic Element did not know whether a liquidation would occur and

was "hopeful" that it would not.  Basic Element CEO Moldazhanova testified that ██████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[126]

Likewise, Mr. Yashchenko conceded that as █████████████████████████

███████████████████████████████████████████████

████████████████████████████,[127]

---

[124] Ex. 54 (Woodruff Tr.) at 154:18–24.

[125] Ex. 42 at BNPP004229 ("███████████████████████████████

████████████████████████

████████████); *id.* at BNPP004240 ("███████████████████."); Ex. 54
(Woodruff Tr.) at 242:15–243:2 ("███████████████████████████

███████████████████████████████████████

██████████████████████").

[126] Ex. 1 (Moldazhanova Tr.) at 177:15–16 (emphasis added).

[127] Ex. 2 (Yashchenko Tr.) at 137:22–138:14; *id.* at 145:14–17 (██████████████████

█████████████████████████████████████████); *id.*

31

Indeed, Basic Element officials claim now that they ███████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████████[128] Deripaska testified that the liquidation
was ██████████████████.[129] According to Deripaska, Basic Element███████████
████████████████████████████████[130] Put simply, the
testimony unequivocally shows that Basic Element believed that a liquidation was *not* likely and
found out about the liquidation from the banks, not the reverse.

### B.   Basic Element Refused to Supply Information and Lied

Discovery also shows that rather than conveying any truthful, material non-public
information to Morgan Stanley, Basic Element actively refused to provide information to
Morgan Stanley and the other banks, and lied.  *First*, Basic Element refused to provide Morgan
Stanley and the banks information about its liquidity and cash position.  For example, during a
teleconference with the banks, in response to a question from RBS, Basic Element simply
████████████████████████████████.[131] Moldazhanova told the banks: "I'm
really not kind of – well, disclosing the amount of cash we are having."[132] Moldazhanova

---

at 211:17–21 (███████████████████████████████████
███████████.

[128] Ex. 1 (Moldazhanova Tr.) at 56:4–5; *see also* Ex. 2 (Yashchenko Tr.) at 216:21–25
(███████████████████████████████████); *id.* at 57:22–24 (
████████████████████████,.).

[129] Ex. 4 (Deripaska Tr.) at 63:17–18 (emphasis added).

[130] Ex. 4 (Deripaska Tr.) 87:8–17; *id.* at 88:8–9.

[131] Ex. 1 (Moldazhanova Tr.) at 159:13–17; Ex. 30 at BNPP004073; Ex. 34 at BNPP001735–36.

[132] Ex. 31 at BNPP004150.

32

refused, she testified, because Basic Element ███████████████████████████████████

███████████████ [133] This refusal, of course, is the opposite of conveying confidential, inside

information to Morgan Stanley—Basic Element expressly and repeatedly *declined* to do so.

Moreover, Basic Element kept Morgan Stanley and the other banks in the dark about its

intentions to pay the margin call.  On September 30, 2008, after the first margin call issued,

Basic Element's Yashchenko told BNP that Basic Element would ██████████████████████

████████ [134]  But Basic Element officials thereafter refused to tell the banks whether they

would be paying the margin call—hiding information from the banks rather than conveying it. [135]

It was only during a telephone call with the banks at 12:39 p.m. (E.D.T.) on October 2—after

Morgan Stanley had already taken out its short positions in Magna—that Basic Element first told

the banks that it would not be paying any cash in connection with the margin calls. [136]  Morgan

Stanley, therefore, could not have traded on the basis of supposed information about Basic

Element's decision not to meet the margin call: Basic Element denied providing that information

to Morgan Stanley and the banks in the first place.

In fact, Basic Element officials testified that ███████████████████████████████

████████████████████████████████████████████ [137]  Deripaska testified

that ██████████████████████████████████████████████████████████████████████

---

[133] Ex. 1 (Moldazhanova Tr.) at 162:14–16.

[134] Ex. 25 at VEL_0013259.

[135] Ex. 1 (Moldazhanova Tr.) at 162:17–20.

[136] Ex. 1 (Moldazhanova Tr.) at 168:23–169:7; Ex. 31 at BNPP004157 ("We are not prepared to send any extra cash I'm afraid.").

[137] Ex. 1 (Moldazhanova Tr.) at 184:11–20.

████████ .[138]  Further, on the afternoon of October 1, Deripaska instructed Yashchenko to

████████████████████████████████████████████████

████████████ .[139]

In opposing Morgan Stanley's motion for summary judgment based on collateral estoppel, Veleron's lawyers trumpeted internal Morgan Stanley correspondence suggesting that Basic Element was facing a liquidity crisis and would not meet the margin calls.[140]  But, as just noted, and as Deripaska's officers admitted at their depositions, that information was simply not true: Basic Element was not facing a liquidity crisis and had funds available to pay the margin calls.  At bottom, Veleron's lawyer-driven argument must be rejected in face of the actual evidence uncovered in discovery.  Quite simply, Morgan Stanley could not have traded on the basis of a liquidity crisis at Basic Element because, according to Veleron's own witnesses, the liquidity crisis did not exist.

*Second*, Basic Element lied to Morgan Stanley and the other banks about restructuring. Critically, Basic Element assured the banks that Veleron's debts would be guaranteed by Russian Machines, while privately considering the signed guarantee that Russian Machines had delivered to be invalid.  As noted *supra* pp. 17–18, the guarantee required approval by the Russian Machines board of directors, and Russian Machines assured the banks that ████████

████████████████████████████████████████████████

████████████ .[141]  On October 1, Basic Element sent BNP a

---

[138] Ex. 4 (Deripaska Tr.) at 57:12–17.

[139] Ex. 28 at VEL_0048647; Ex. 29 at VEL_0016036; Ex. 4 (Deripaska Tr.) at 75:11–76:22.

[140] Ex. 55 at MS_VELERON 00000177–78; Veleron's Opposition to the Morgan Stanley Defendants' Motion for Summary Judgment Based on Collateral Estoppel, Dkt. No. 170, at 24.

[141] Ex. 34 at BNPP001726.

signed guarantee and ███████████████████████████████████████████
██ [142]

    But privately, Basic Element considered the guarantee to be invalid because it had never been approved by the board of directors.  Moldazhanova testified that the ████████████████ ████████████████████████████████████████████████ ██ [143]  Nonetheless, Moldazhanova lied to the banks, representing to them that ██████████ ████████████████████████████████████████████████████████████ █████████ [144]

    Moreover, as part of the restructuring negotiations, the banks reminded Basic Element that, having sent the Russian Machines guarantee, the loan no longer was non-recourse: "Remember though, you've issued us with a guarantee, so if we lose losses on selling the security, if we decide to go that route, the shortfall is still due by your company under the guarantee you've issued." [145]  Moldazhanova did not correct the banks' misperception that she had induced.  Instead, she allowed the banks to ███████████████████████ [146] Ultimately, after Deripaska decided to default, Veleron told the banks that ████████████ ████████████████████████████ [147]  This, too, turns out to be another lie—in

---

[142] Ex. 38 at VEL_020381–94; Ex. 37 at VEL_0020362.

[143] Ex. 1 (Moldazhanova Tr.) at 98:3–101:2.

[144] Ex. 1 (Moldazhanova Tr.) at 101:2–103:7; 167:8–168:8.

[145] Ex. 31 at BNPP004154.

[146] Ex. 1 (Moldazhanova Tr.) at 168:7–8.

[147] *See supra* pp. 20–21.

WEIL:\95107832\1\64093.0028

discovery, ███████████████████████████████.[148]

Basic Element's deception was not limited to the guarantee.  Moldazhanova told the banks that ███████████████████████████████████,[149]  But Basic Element had not applied to the VEB when she made that representation,[150] and Basic Element harbored doubts whether Veleron, Russian Machines or Basic Element qualified for the program.[151]  A similar story played out with Basic Element's efforts to obtain cash from Magna: Basic Element represented that the possibilities were more certain than it privately knew them to be.[152]

In the end, Veleron's claims regarding the supposed liquidity crisis and restructuring efforts ultimately boil down to allegations that Morgan Stanley misappropriated and traded on information that Basic Element either withheld from it or lied about.  We are aware of no case suggesting that Veleron can recover under these circumstances.

## III.   MORGAN STANLEY DID NOT OWE VELERON A DUTY OF TRUST AND CONFIDENCE

Even if Veleron had provided material information to Morgan Stanley (it did not), Veleron's insider-trading claim fails because Veleron cannot show that Morgan Stanley misappropriated information in violation of a duty of trust and confidence owed to the source of the information.  *See O'Hagan*, 521 U.S. at 652.  Section 10(b) does not "impose a 'general

---

[148] Ex. 39 at VEL_0014381; Ex. 40 at VEL_0014385.

[149] Ex. 30 at BNPP004052.

[150] Ex. 1 (Moldazhanova Tr.) at 120:16–25.

[151] As the Veleron internal email shows, ███████████████████████
████████████████████████████████████████
███████████████  Ex. 56 at VEL_0002128–31.

[152] Ex. 1 (Moldazhanova Tr.) at 106:2–13.

duty' between all participants in market transactions to forgo action based on material, nonpublic information.'" *O'Hagan*, 521 U.S. at 662 (quoting *Chiarella v. United States*, 445 U.S. 222, 233 (1980)). Rather, as this Court explained, "'the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.'" MTD Order at 26 (quoting *O'Hagan*, 521 U.S. at 652).

Critically, not just any relationship gives rise to an actionable duty. To be liable under Section 10(b), a person must trade on the basis of material nonpublic information "in breach of a *fiduciary* duty or similar relationship of trust and confidence." *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991) (en banc) (emphasis added).[153] "A fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information." *Id.* at 567. That is, "courts will not construct a duty of confidentiality simply because confidential information was thrust upon a recipient without obtaining an explicit confidentiality agreement." *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 544 (S.D.N.Y. 2009). Moreover, as the Second Circuit explained, "[q]ualifying relationships are marked by the fact that the party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information." *United States v. Falcone*, 257 F.3d 226, 234–35 (2d Cir. 2001).

### A.    No Confidentiality Agreement Exists

Morgan Stanley never entered into any confidentiality agreement with Veleron or BNP. The Court let this action proceed on the assumption that "Morgan Stanley should have signed a confidentiality agreement" with BNP, and "[a]ccordingly, Morgan Stanley owed BNP a duty to

---

[153] *See also S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 249 n.5 (S.D.N.Y. 2013) ("The key element to any misappropriation case is a fiduciary relationship, or a functional equivalent, between two parties.").

keep confidential information about the BNP/Veleron Credit Agreement (including the disposition of the collateral for the Loan evidenced in that agreement)."[154] The Court further assumed that "Morgan Stanley did sign such an agreement," but acknowledged that "[w]hether it actually did so is not a matter to be determined on a motion to dismiss." *Id.*

Now is the time to make that determination:  discovery has shown that Morgan Stanley never signed a confidentiality agreement with Veleron or BNP.  This Court previously focused on Section 14.12(1)(a) of the Credit Agreement, which provides that before sharing certain information with third-parties, BNP must seek and obtain a confidentiality agreement from the third party—in a form acceptable to Veleron.[155]  Discovery has shown that BNP never sought, Morgan Stanley never provided, and Veleron never approved any confidentiality agreement.  A confidentiality agreement simply does not exist.

More generally, Morgan Stanley had no contractual relationship with Veleron concerning the margin loan: Morgan Stanley was not a party to the Credit Agreement between Veleron and BNP, and Veleron was not a party to either of the agreements Morgan Stanley had with BNP— the Disposal Agreement or the Swap Agreement.[156]  Furthermore, as this Court previously held, Veleron was not a third-party beneficiary of the Disposal Agreement.[157]  Finally, Veleron had no

---

[154] *See* MTD Order at 28.

[155] *See* MTD Order at 28.

[156] Morgan Stanley also was not a "Lender" under the Credit Agreement.  Lenders under may have assumed confidentiality obligations.  But to be a "Lender," a party must execute and return to Veleron an Assignment and Assumption Agreement as described in Section 13.1(3)(b) of the Credit Agreement.  Morgan Stanley never executed, and Veleron never received, any such Assignment and Assumption Agreement.  MTD Order at 44.

[157] MTD Order at 38–41.

WEIL:\95107832\1\64093.0028

role in the negotiation of the Swap.[158]

Furthermore, the Credit Agreement did not require BNP to obtain a confidentiality agreement to share the alleged inside information with Morgan Stanley.   Under Section 14.12(1)(c) of the Credit Agreement, BNP had no obligation to seek or obtain a confidentiality agreement before sharing information "already in [BNP's] possession" or information "lawfully and properly received from another source."[159] As discussed *supra*, the alleged inside information here—information concerning *BNP*'s margin calls to Veleron and *BNP*'s and the *banks'* decision to dispose of the collateral—falls squarely within Section 14.12(1)(c):  it was information that, by definition, Veleron could not have provided.  If anything, it was information "already in BNP's possession" or "lawfully received from another source"—the margin call notices and the decision to liquidate came from BNP, not Veleron.  And the Morgan Stanley swap agreement with BNP specified that Morgan Stanley did not need to sign a confidentiality agreement to obtain this information from BNP, and never did.

Moreover, neither of the two agreements Morgan Stanley signed with BNP imposes confidentiality restrictions, establishes fiduciary duties, or creates a relationship of trust and confidence with BNP, much less with Veleron, a non-party to those agreements.  The Swap Agreement specifically required BNP to inform Morgan Stanley about any margin calls that BNP issued to Veleron, any pre-payment of the margin loan, and any events of default.[160]  And the Swap Agreement disclaims that it gives rise to any confidentiality obligation:  "a party receiving information from the other party with respect to such Credit Derivative Transaction

---

[158] Ex. 1 (Moldazhanova Tr.) at 26:17–31:20.

[159] Ex. 8 (Credit Agreement § 14.12(1)(c)) at VEL_0004785–86.

[160] Ex. 12 (Swap Agreement Section 7(g)) at BNPP000600.

shall *not* become subject to any obligation of confidentiality in respect of that information."[161]

Likewise, the Agency Disposal Agreement provides that Morgan Stanley "has acted and is acting as an independent contractor and not as a fiduciary."[162]  That the Disposal Agreement omits any mention of confidentiality obligations is significant.  The essential point of the Disposal Agreement was for BNP to formalize Morgan Stanley's role as disposal agent if a default occurred and BNP decided to sell the collateral.  In other words, the Disposal Agreement only becomes important when a sale of the collateral is imminent, and BNP necessarily would have to keep Morgan Stanley informed about any liquidation.  But the Disposal Agreement imposes no confidentiality restrictions on information concerning the disposal.

Finally, no duty of confidentiality owed by Morgan Stanley to Veleron arises from the "Investor Pack," a document purportedly circulated to Morgan Stanley in October 2007, as BNP was soliciting parties to join as Lenders to the Credit Agreement.  None of the purported inside information on which Morgan Stanley allegedly traded—information about the margin calls and the liquidation of the collateral in October 2008—is disclosed in the Investor Pack, nor could it have been: the Investor Pack pre-dates the alleged material, non-public information by more than a year.  And, in any event, Magna disclosed all information about the margin loan and Credit Agreement contained in the Investor Pack in an October 2007 public filing.[163]

---

[161] Ex. 13 (2003 ISDA Credit Derivative Definitions Section 9.1(b)(v)) (emphasis added).

[162] Ex. 14 (Disposal Agreement § 2) at BNPP000527–28.

[163] Ex. 9 (Magna Schedule 13D); *see also* Ex. 11 at MS_VELERON 00000579 ("The Recipient shall have no obligation hereunder with respect to any Evaluation Material to the extent such information . . . is or becomes publicly available other than as a result of a disclosure by the Recipient in violation of this agreement.").

**B.    Morgan Stanley's Internal Compliance Polices Do Not Give Rise to a Duty to, and Are Not Enforceable by, Veleron**

Veleron also cannot locate a duty of trust and confidence running to *Veleron* in Morgan Stanley's internal compliance policies that Veleron has made a cornerstone of its case.  Although it mentions them nowhere in the FAC, Veleron has shown obsessive focus in discovery on Morgan Stanley's internal policies, suggesting that they give rise to some "duty"—enforceable by private third parties—to keep certain information confidential.  This attempt to manufacture liability based on internal policies is unprecedented:  there has never been a successful private insider trading case premised on a company's alleged violation of its own internal policies.

Nothing in the case law or in Morgan Stanley's internal compliance policies suggest that the policies give rise to private rights of action by third parties.  *See J.E. Hoetger & Co. v. Ascenio*, 572 F. Supp. 814, 822 (E.D. Mich. 1983) (The case law "in no way hold[s] that a broker can be held liable for violation of its own internal operating rules which are not known of or relied upon by investors."); *cf. Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 413 (2d Cir. 2009) (holding that customer agreements incorporating regulatory rules do not create private causes of action for violating those rules).  For insider trading liability under the misappropriation theory, a "fiduciary-turned-trader" must violate a relationship of trust and confidence owed to the source of the information.  *See Chestman*, 947 F.2d at 566.  Morgan Stanley's compliance policies do not unilaterally create these relationships, much less with third party strangers to the policies.[164]

Accordingly, it is unsurprising that we have not located (and Veleron has never cited) any case brought by a private third party predicating insider-trading liability on a company's purported violations of its own internal compliance policies.  As courts have acknowledged,

---

[164] As discussed *infra* pp. 41–43, there is no evidence Veleron read or was even aware of Morgan Stanley's internal policies before this litigation.

doing so would discourage companies from adopting compliance policies that demand more than what the law requires. "There are sound practical reasons for not allowing a private cause of action predicated upon violation of internal rules or policies. . . . [I]f such liability were allowed, it would impose the greatest additional liability on those firms policing themselves rigorously through the imposition of stringent internal guidelines; effectively punishing the diligent and favoring the lax." *Hoetger*, 572 F. Supp. at 822.[165]

Nor can Veleron claim rights under Morgan Stanley's internal compliance policies as a third-party beneficiary. For Veleron to show that it was an third-party intended beneficiary of the policies, it would have to establish: "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [Veleron's] benefit, and (3) that the benefit to [Veleron] is sufficiently immediate to indicate the assumption by the contracting parties of a duty to compensate [Veleron] if the benefit is lost." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182, 944 N.E.2d 1104, 1110 (2011). Moreover, "[a]n agreement that confers only an incidental benefit on the plaintiff will not suffice" to make out a third-party beneficiary claim. Dkt 117 at 38.

Veleron cannot show that Morgan Stanley intended to benefit any third party, much less Veleron, in adopting these policies. Indeed, Veleron never saw these policies before this litigation, including any policies posted to the Morgan Stanley website.

### C.   Morgan Stanley Cannot Be Liable Because of Its Relationship with BNP

This Court previously raised as a possibility that Morgan Stanley could be liable because of its relationship with BNP. The Court suggested that Morgan Stanley could be liable in its

---

[165] In addition, "there are the practical problems involved in requiring a court to determine whether a firm's internal policies are in fact being violated. Such written or unwritten policies may be quite complicated and their requirements are often not self evident." *Hoetger*, 572 F. Supp. at 822.

WEIL:\95107832\1\64093.0028

capacity as BNP's disposal agent if it "stepped into" BNP's shoes and owed the same duties to

Veleron as BNP would.[166] The Court also suggested Morgan Stanley could be liable under an

"intermediary as source" theory, whereby Veleron could recover from Morgan Stanley if it could

show that Morgan Stanley breached a duty it owed to BNP, the intermediary between Veleron

and Morgan Stanley.[167]  Discovery has shown that neither theory supports liability here.

Both theories presuppose that Veleron communicated material information to BNP

(which then passed information to Morgan Stanley).  But, as discussed *supra* pp. 28–36, Veleron

never conveyed—to anyone—much of the alleged inside information. Rather the information—

the margin calls and the decision whether to liquidate the collateral—originated with BNP and

the other banks. And the remaining information is lies. So, neither theory gets past the threshold.

Nonetheless, the agency theory fails. The existence and parameters of an agency

relationship are "determined not by the nomenclature . . . 'agent', but instead by the services

agreed to under the contract between the parties." *World Wrestling Entm't Inc. v. Jakks Pac.,*

*Inc.*, 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007), *aff'd*, 328 Fed. App'x 695 (2d Cir. 2009). As the

Supreme Court recently held, "the fact that one may be an agent for one purpose does not make

him or her an agent for every purpose." *Daimler AG v. Bauman*, 134 S. Ct. 746, 759 (2014)

(quotations omitted).  As noted *supra* pp. 11–12, the Disposal Agreement that actually governs

BNP's relationship with Morgan Stanley disclaims that it gave rise to any fiduciary duties.  And,

notwithstanding that facilitating the disposal was the core purpose of the agreement, the

agreement does not restrict Morgan Stanley's use of information concerning the disposal.  Nor

does anything in the Disposal Agreement suggest that Morgan Stanley was "stepping into"

---

[166] *See* MTD Order at 33.

[167] *See* MTD Order at 33.

BNP's shoes and assuming all fiduciary or other duties that BNP owed to Veleron.

Indeed, inferring a duty of confidentiality here based solely on general agency principles would supplant Morgan Stanley and BNP's specific agreements to the contrary. Liability under the misappropriation theory presupposes not just any relationship, but a fiduciary or similar relationship of trust and confidence. *Chestman*, 947 F.2d at 566. But here, the two agreements—the Disposal Agreement and Swap Agreement—that specifically govern the relationship between Morgan Stanley and BNP expressly disclaim a fiduciary relationship and confidentiality obligations. Using general agency principles to nonetheless construct a fiduciary or similar relationship would effectively rewrite those provisions and undo the parties' agreements. This result would contravene established precedent under the misappropriation theory that the required fiduciary or similar duties cannot be imposed unwillingly or unilaterally, *see, e.g.*, *id.* at 567, and would also contravene the law of agency, which limits the scope of an agency relationship to the scope delineated in the parties' agreement. *World Wrestling Entm't*, 530 F. Supp. 2d at 504.

The "intermediary as source" theory fares no better. Relying on *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 546 (S.D.N.Y. 2009), this Court suggested that Morgan Stanley could be liable to Veleron if it breached a duty of confidentiality owed to BNP, Morgan Stanley's allegedly immediate source of information and an "intermediary" between Veleron and Morgan Stanley. *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 546 (S.D.N.Y. 2009) ("As long as the SEC can establish that defendants owed a duty to the intermediary, liability under the misappropriation theory is still possible as a matter of law.") (citing *S.E.C. v. Talbot*, 530 F.3d 1085, 1093 (9th Cir. 2008)). Discovery has dismantled that theory. The Swap Agreement specifically provided that BNP was to tell Morgan Stanley about the margin calls without imposing any confidentiality obligations

on the Morgan Stanley's receipt of that information.  Further, Morgan Stanley did not owe BNP

any fiduciary duty or similar duty of trust and confidence.  As noted, the Disposal Agreement

disclaimed giving rise to any fiduciary relationship.  *See U.S. Bank Nat'l Ass'n v. Ables & Hall

Builders*, 696 F. Supp. 2d 428, 442-43 (S.D.N.Y. 2010) (finding when, among other reasons,

"Defendants specifically disclaimed the existence of a fiduciary relationship in the swap

transaction that they signed," "no fiduciary relationship existed between the Bank and

defendants").

Additionally, Morgan Stanley stood at arm's length to BNP in both of their relationships,

further supporting the fact that Morgan Stanley owed no duty to BNP. "[P]arties to arms length

commercial contracts do not owe each other a fiduciary obligation," *Greenberg v. Chrust*, 198 F.

Supp. 2d 578, 585 (S.D.N.Y. 2002), and the exchange of even confidential information "does

nothing to change their relationship from arms-length into a fiduciary relationship." *United

States v. Cassese*, 273 F. Supp. 2d 481, 485-87 (S.D.N.Y. 2003); *see also U.S. Bank Nat'l Ass'n*,

696 F. Supp. at 442 ("Absent extraordinary circumstances, . . . parties dealing at arms length in a

commercial transaction lack the requisite level of trust or confidence between them necessary to

give rise to a fiduciary obligation.") (quotations omitted).  Discovery has revealed that Morgan

Stanley did not accept a duty of confidentiality during its dealings with BNP.

Moreover, even if Morgan Stanley did owe fiduciary duties to BNP, Veleron still could

not establish liability to *Veleron* based on an alleged "chain" of fiduciary duties flowing from

Morgan Stanley to BNP and then from BNP to Veleron, as suggested in *Lyon*.  *Lyon* (and *SEC v.

Talbot*, 530 F.3d 1085, 1093 (9th Cir. 2008), on which *Lyon* relies) both were SEC enforcement

actions.  The SEC has plenary power to enforce the securities laws, including based on a duty

owed to an intermediary, but private parties do not—a private party cannot sue to enforce

another party's rights, including a breach of a duty owed to a third party. *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 13 (2d Cir. 1983) ("the district court was correct in concluding that 'plaintiff cannot hope to piggyback upon the duty owed by defendants to Morgan Stanley and Warner. There is no 'duty in the air' to which any plaintiff can attach his claim.'"). We have located no case in which a private party has prevailed on a claim that a defendant breached a fiduciary duty owed to an intermediary.  Veleron, therefore, must show that Morgan Stanley breached a duty specifically owed to Veleron.  Veleron cannot do so.

## IV.   MORGAN STANLEY'S UNCONTROVERTED EVENT STUDY SHOWS THAT THE INFORMATION WAS NOT MATERIAL AS A MATTER OF LAW

Veleron's claim fails for another independent reason: the evidence demonstrates that the alleged inside information—the margin calls and the impending liquidation of the Magna shares—was not "material."  The evidence shows that revealing this purported "inside" information to the market had no statistically significant impact on the price of Magna stock.

Information is "material" if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); *see also ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  The materiality standard is objective: "The question of materiality is, however, an objective one, involving the significance of the information to a reasonable investor." *S.E.C. v. Siebel Sys.*, 384 F. Supp. 2d 694, 704 (S.D.N.Y. 2005); *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013) ("[M]ateriality is judged according to an objective standard.").  And courts have often defined materiality in terms of how a particular piece of information is likely to affect the market price for a security. *See Elkind v. Ligget & Myers, Inc.*, 635 F.2d 156, 166 (2d Cir. 1980) ("[T]he disclosed information must be reasonably certain to

WEIL:\95107832\1\64093.0028

have a substantial effect on the market price of the security."); *cf. O'Hagan*, 521 U.S. at 653

("The misappropriation theory is thus designed to protect the integrity of the securities markets

against abuses by outsiders to a corporation who have access to confidential information that *will*

*affect the corporation's security price* when revealed.") (emphasis added).

Courts have therefore looked to event studies—economic analyses that attempt to isolate

the effect of information on the price of a security—as the gold standard in assessing materiality

and determining whether the release of information has a significant effect on market prices. *See*

*United States v. Martoma*, 993 F. Supp. 2d 452, 457 (S.D.N.Y. 2014) ("Expert testimony

concerning materiality often takes the form of an 'event study,' which 'refers to a regression

analysis that examines the effect of an event on some dependent variable, such as a corporation's

stock price.") (citations omitted); *In re Vivendi S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364

(S.D.N.Y. 2009) ("It is an expert that produces the almost obligatory 'event study' that begins by

isolating stock declines associated with market-wide and industry-wide downturns from those

specific to the company itself."). Courts have dismissed cases in which plaintiffs have failed to

produce any evidence of materiality, including failing to introduce an event study or other

evidence of the price impact of the allegedly material information. *See, e.g.*, *Berks Cnty. Emps.'*

*Ret. Fund v. First Am. Corp.*, 734 F. Supp. 2d 533, 539-40 (S.D.N.Y. 2010) (Kaplan, J.).

Discovery shows that the alleged inside information concerning the liquidation had no

statistically significant impact on the price of Magna stock on October 3, 2008 when the

liquidation occurred, or for several days thereafter. Specifically, Morgan Stanley's expert

witness, Dr. Patrick Conroy, conducted an event study that determined that "there was no

statistically significant reaction in Magna stock price on October 3, 2008 when the default and

liquidation was announced and the ABB occurred."[168]  Dr. Conroy's event study is

uncontroverted.  Veleron's expert witnesses did not conduct an event study, much less an event

study that found a statistically significant price impact on Magna stock.  Nor did Veleron

develop expert testimony to rebut Dr. Conroy's event study.  So, the only record evidence on the

market's reaction to the alleged inside information is Dr. Conroy's event study that shows that

the market as a whole—the prototypical compilation of "reasonable" investors—yawned when

confronted with the information.

## V.    VELERON CANNOT PROVE LOSS CAUSATION AND DAMAGES

Veleron fails to meet its burden of proving that Morgan Stanley caused Veleron any

damages.  As discussed *supra* pp. 23–27, Veleron—an SPV—suffered no injury caused by

Morgan Stanley's short sales and, therefore, has no standing to sue for the alleged injury suffered

by Russian Machines.  Having never paid any of the deficiency (much less all of it), it follows

that Veleron has suffered no damages resulting from any trading that allegedly increased the size

of the deficiency.  Nonetheless, even if Veleron could somehow claim rights to Russian

Machines' damages, Veleron has no reliable evidence of those damages.

Veleron attempts to meet its burden to prove its damages by proffering the testimony of

Dr. Sanjay Unni.  Dr. Unni's theory is that Morgan Stanley's short selling diminished the value

of the Magna shares when they were liquidated by an "average" of $8.27 million.  As Morgan

Stanley explains in its accompanying motion to strike, Dr. Unni's testimony must be excluded as

unreliable.  Dr. Unni concedes that his estimate is based on a methodology he invented that has

never before been used to measure price impact from trading. His estimate rests on an average of

wildly disparate results produced by four models, ranging from $5.9 million to more than double

---

[168] Ex. 57 (Expert Report of Dr. Patrick Conroy) ¶ 9(a) & Exhibit 5.

that—$12.6 million.  Critically, Dr. Unni cannot say that any one of his chosen models generates

a more reliable result than any other.  So, Dr. Unni's analysis is insufficient to meet Veleron's

burden of proof; it cannot support any damages estimate by a preponderance of the evidence.

With Dr. Unni's testimony excluded, and absent any other evidence of its damages,

Veleron's claim must be dismissed.  *See Valente v. Textron, Inc.*, 559 F. App'x 11, 14 (2d Cir.

2014) (affirming grant of summary judgment because, based on district court's exclusion of

Valente's expert testimony, "the record is devoid of any evidence supporting Valente's theory");

*see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 271 (2d Cir. 2002); *Brooks v.*

*Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000).  Without more, Veleron cannot prove

damages and, therefore, its claims against Morgan Stanley should be dismissed.  *See Bank of*

*Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 345-51 (S.D.N.Y. 2013).

## VI.   VELERON'S MARKET MANIPULATION CLAIM FAILS

Finally, Veleron's claim based on a market manipulation theory also fails.  To the extent

Veleron bases this claim on Morgan Stanley's short sales, it fails for the same reasons as its

insider-trading claim.  Veleron's theory of harm from the market manipulation claim is identical

to its insider-trading claim—the short selling depressed the price of the shares during the ABB,

leaving a greater deficiency.  But Veleron, having suffered no injury-in-fact from the deficiency,

lacks standing to bring this claim, whether styled as insider-trading or market manipulation.

The claim also fails on the merits.  Veleron must prove that Morgan Stanley engaged in

manipulative acts, "practices such as wash sales, matched orders, or rigged prices, that are

intended to mislead investors by artificially affecting market activity."  *Santa Fe Indus., Inc. v.*

*Green*, 430 U.S. 462, 476 (1977). Veleron cannot allege, much less prove, any manipulative acts.

Veleron alleges Morgan Stanley's short sales, but "short selling—even in high volumes—is not,

by itself, manipulative." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir.

2007) ("In essence, taking a short position is no different than taking a long position."). "To be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security." *Id.* Here, where Morgan Stanley engaged in normal hedging activity, the evidence does not support any such showing.

Furthermore, to the extent Veleron rests its market manipulation claim on Morgan Stanley's activities during the ABB, that claim fails at the threshold because Veleron cannot show that the ABB was an efficient market, a cornerstone requirement of a market manipulation claim. *See In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 306 (S.D.N.Y. 2009) ("[A] necessary element of a market manipulation claim is that the damage alleged was caused by reliance on an (ultimately incorrect) assumption of an efficient market free of manipulation."). To the contrary, the evidence shows, and the FAC concedes, that the ABB was *not* an efficient market, but instead a sale, conducted not through a stock exchange, directly to individual and institutional investors.[169]

## CONCLUSION

For the foregoing reasons, the Court should grant Morgan Stanley's Motion for Summary Judgment and dismiss the First Amended Complaint with prejudice.

---

[169] FAC ¶¶ 130, 148.

Dated: September 30, 2014
      New York, New York

Respectfully submitted,

Jonathan D. Polkes
Paul Dutka
Adam B. Banks
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
jonathan.polkes@weil.com
paul.dutka@weil.com
adam.banks@weil.com

*Counsel for Defendants Morgan Stanley,
Morgan Stanley Capital Services, Inc.,
Morgan Stanley & Co. Inc., and Morgan
Stanley & Co.*

WEIL:\44531574\27\64093.0028